## CORY ET AL. *v.* CARTER.

CONSTITUTIONAL LAW.—*Schools.*—*Education of Colored Children.*—*Separate Schools.*—The act of May 13th, 1869 (3 Ind. Stat. 472), entitled "an act to render taxation for common school purposes uniform, and to provide for the education of the colored children of the State," provides that a school tax shall be levied, without regard to the race or color of the owner of the property taxed; that all children, without regard to race or color, shall be included in the enumeration for school purposes, the colored children to be enumerated in separate lists from those in which the other school children are enumerated, and to be organized into separate schools, having all the rights and privileges of other schools; and if there be not a sufficient number of colored children, within attending distance, to form a separate school for each district, it is provided, that the trustees may consolidate several districts into one; or if there be not a sufficient number of colored children within reasonable distance to thus consolidate, the trustees shall provide such other means of education for colored children as shall use their proportion, according to number, of school revenue to the best advantage.

*Held,* in a suit by a negro father for a mandate to compel the admission of his children into a school for white children, that this statute is not in conflict with section 19 of article 4 of the state constitution, which provides, that every act shall ."embrace but one subject and matters properly connected therewith; which subject shall be expressed in the title."

*Held,* also, that the statute is not in conflict with section 23 of article 1 of the state constitution, which declares, that "the General Assembly shall not grant to any citizen, or class of citizens, privileges or immunities which, upon the same terms, shall not equally belong to all citizens."

*Held,* also, that said statute is not in conflict with section 1 of article 8 of the state constitution, which makes it the duty of the General Assembly "to provide by law for a general and uniform system of common schools, wherein tuition shall be without charge, and equally open to all."

*Held,* also, that said statute is not in conflict with section 2 of article 4 of the Constitution of the United States, which declares, that "the citizens of each state shall be entitled to all privileges and immunities of citizens in the several states."

*Held,* also, that said statute is not in conflict with the thirteenth or fourteenth amendment of the Constitution of the United States, or with earlier amendments, or with the act of Congress of April 9th, 1866, known as the "Civil Rights Bill."

SAME.—*Thirteenth Amendment of Constitution of United States.*—The thirteenth amendment abolished slavery within the limits of the United States.

SAME.—*Fourteenth Amendment.*—*First Clause.*—The first clause of the fourteenth amendment made negroes citizens of the United States, and citi-

zens of the State in which they reside, and thereby created two classes of citizens, one of the United States and the other of the state.

SAME.—*Second Clause.*—The second clause of said amendment prohibits the states from abridging the privileges and immunities of citizens of the United states. This clause places the privileges and immunities of citizens of the United States under the protection of the Federal Constitution, and leaves the privileges and immunities of citizens of a state under the protection of the constitution and laws of the state. The second clause simply contains an inhibition of power to the states, and does not confer upon the Federal Government power to protect or enforce, by legislation, the privileges and immunities of citizens of a state.

SAME.—*Third and Fourth Clauses.*—The third and fourth clauses of the fourteenth amendment only prohibit the states from doing acts which they were prohibited from doing by other clauses of the Federal Constitution.

SAME.—*Thirteenth, Fourteenth, and Fifteenth Amendments.—Limitation of Power of State.*—The thirteenth, fourteenth, and fifteenth amendments to the Federal Constitution impose the following limitations and restrictions upon the sovereign power of the State of Indiana: 1. The State cannot in the future, while a member of the Federal Union, change her constitution so as to create or establish slavery or involuntary servitude, except as a punishment for crimes whereof the party shall have been convicted. 2. The State cannot deny to a citizen of the United States or deprive him of those national rights, privileges, and immunities which belong to him as such citizen. 3. The State must recognize as its citizens any citizen of the United States who is or becomes a *bona fide* resident therein. 4. The State must give to each citizen of the United States, who is or becomes a *bona fide* citizen therein, the same rights, privileges, and immunities secured by her constitution and laws to her white citizens.

SAME.—*Common Schools.*—The system of common schools in this State has its origin in, and is provided for by, the constitution and laws of this State. It is purely a domestic institution, and subject to the exclusive control of the constituted authorities of the State. The Federal Constitution does not provide for any general system of education to be conducted and controlled by the National Government, nor does it vest in Congress any power to exercise a general or special supervision over the states on the subject of education.

SAME.—*Uniformity of Schools.*—Under our constitution, our common school system must be general, uniform, and equally open to all, but uniformity will be secured when all the schools of the same grade have the same system of government and discipline, the same branches of learning taught, and the same qualifications for admission.

SAME.—The legislature, under our state constitution, as it existed without the limitations imposed upon the sovereign power of the State by the fourteenth amendment, had the power to provide for the education of only

the white children of the State; but since its ratification no system of public schools would be general, uniform, and equally open to all, which did not provide for the education of the colored children of the State.

SAME.—The classification of scholars, on the basis of race or color, and their education in separate schools involve questions of domestic policy which are within the legislative discretion and control, and do not amount to an exclusion of either class.

SAME.—*Power of Courts.*—The legislature has not provided for the admission of colored children into the same schools with the white children, in any contingency; and even if the fourteenth amendment absolutely required their admission, the courts cannot, in the absence of legislative authority, confer that right upon them.

SAME.—The legislature has the power to provide for either separate or mixed schools, but it having failed to provide for mixed schools, the courts must execute the law as it comes from the law-making department of the government. If the act of May 13th, 1869, should be held unconstitutional and void, there would then be no law providing for the enumeration and education of the colored children of the State, and they would be left without any provision whatever for their education.

SAME.—*Construction of Statute.*—There being no averment that the trustee had failed to provide for the education of the children of the plaintiff outside of the schools for the white children, no question arose as to what would be a compliance with such provision of the statute.

From the Marion Superior Court.

*N. B. Taylor, F. Rand,* and *E. Taylor,* for appellants.

*J. W. Gordon, T. M. Browne,* and *R. N. Lamb,* for appellee.

BUSKIRK, J.—This was a proceeding by mandate, on the part of the appellee against the appellants. The appellee, in his petition, alleged that he was a citizen of the State of Indiana and resided in school district number two, in Lawrence township, Marion county, in the said State, and was a taxpayer therein; that he was the father of two children, Mary and Edward Carter, and the grandfather of Lucy and John Carter, all of whom resided with him; that he was a negro of African descent, and that his said children and grandchildren were all negroes of the full blood and of the same descent; that his children and grandchildren were respectively of the age that entitled them to the benefits of the common schools in the said district; that there was a common school for white

children in progress in said district, and that his said children and grandchildren presented themselves at the school-house in said district and demanded admission and to be taught therein with the white children, but were refused admittance by the appellants Beaver and Craig, the director and teacher of said school, for the reason that the said school was a school for white children, and not for negro children; that after the refusal aforesaid, he caused to be served upon the appellants a written request and demand that his said children and grandchildren should be received and taught in the said school with the white children of said district, but they were refused admission solely upon the ground that they were negroes; that said appellants and all other persons have wholly neglected, failed, and refused, and still neglect, fail, and refuse, to provide any school in said district, or in any adjoining district, near enough for said children or grandchildren to attend as scholars; and that by reason of the premises his said children and grandchildren are denied all opportunity to attend any school in said district or elsewhere in the neighborhood, as in right and law they are entitled to do.

There is no allegation that the trustee of said school district number two had failed or refused to provide the means of education for such children within the district, outside of the said school for white children, to the extent of their proportion, according to number, of the school revenues of the said district.

The aid of the court was requested to declare the right of admission of said negro children into the school for white children, and to compel the appellants to admit them.

An alternate writ was issued against the appellants, requiring them to admit such children into the school in said district for white children or appear and show cause why they should not so admit such children.

The appellants appeared and filed separate demurrers to the complaint, upon the ground that it did not state facts sufficient to constitute a cause of action, but the demurrers were overruled; and the appellants refusing to plead further, but elect-

ing to stand by their exceptions to the rulings of the court, the court gave judgment for a peremptory writ of mandate.

The appellants appealed to the general term, where the judgment of the special term was affirmed.

The error assigned is, that the superior court, in general term, erred in affirming the judgment of the court in special term.

The question presented for our decision is, whether the court below erred in overruling the demurrer to the complaint, the correct solution of which will depend upon the proper construction to be placed upon the constitution and statutes of this State and the Constitution of the United States; and as preliminary to the consideration of the grave constitutional questions arising in the record, we proceed to inquire what provisions the legislature has made for the education of the white and colored children of the State.

The act of March 6th, 1865, provided for the annual assessment and collection of a tax on the property, real and personal, in the State (except that owned by negroes and mulattoes), for supporting a general system of common schools in the State. It provided for the enumeration each year of the white children within the respective townships, towns, and cities in the State, between the ages of six and twenty-one years, exclusive of married persons. It provided the officers and agencies for the system, the mode and means of carrying it on, for locating and establishing schools, and carrying them on, for building school-houses, and employing teachers, etc. It was essentially white—none but white children between the named ages, and who were unmarried, were entitled to its privileges. 3 Ind. Stat. 440–472; *Draper* v. *Cambridge*, 20 Ind. 268.

At the session of the legislature of this State next after the ratification of the fourteenth amendment to the Constitution of the United States, an act was passed by the General Assembly of this State, entitled "an act to render taxation for common school purposes uniform, and to provide for the education

of the colored children of the State," which was approved May 13th, 1869, and is as follows:

"Section 1. Be it enacted by the General Assembly of the State of Indiana, that in assessing and collecting taxes for school purposes under existing laws, all property, real and personal, subject to taxation for State and county purposes, shall be taxed for the support of common schools without regard to the race or color of the owner of the property.

"Sec. 2. All children of the proper age, without regard to the race or color, shall hereafter be included in the enumeration of the children of the respective school districts, townships, towns and cities of this State for school purposes; but in making such enumeration the officers charged by law with that duty shall enumerate the colored children of proper age, who may reside in any school district, in a separate and distinct list from that in which the other school children of such school district shall be enumerated.

"Sec. 3. The trustee or trustees of each township, town or city, shall organize the colored children into separate schools, having all the rights and privileges of other schools of the township : Provided, there are not a sufficient number within attending distance, the several districts may be consolidated and form one district. But if there are not a sufficient number within reasonable distance to be thus consolidated, the trustee or trustees shall provide such other means of education for said children as shall use their proportion, according to numbers, of school revenue to the best advantage.

"Sec. 4. All laws relative to school matters, not inconsistent with this act, shall be deemed applicable to colored schools.

"Sec. 5. Whereas an emergency exists for the immediate taking effect of this act, the same shall be in force from and after its passage." 3 Ind. Stat. 472.

Prior to the passage of such act, the assessment of taxes for school purposes had been confined to the property of white persons. The first section provided for the levy and collection

of a tax for school purposes upon all the property within the State subject to taxation, without regard to the race or color of the owner.

The second section adds to the enumeration directed in section 14 of the act of March 6th, 1865, all colored children of the proper age, within the State, and directs them to be enumerated at the same time with the white children, but in a separate list or class from that in which the white children are enumerated.

The third section commands the trustees of each township, town, or city in the State to organize the colored children therein into separate schools, with all the rights and privileges of white schools in the particular township, town, or city. But if the number of colored children within attending distance are not sufficient to organize a school, the trustees may consolidate several districts into one, for that purpose. And if the number of colored children within reasonable attending distance are not sufficient to be thus consolidated, the trustees shall provide such other means of education for such colored children as shall use their proportion, according to numbers, of the school revenue to the best advantage.

The fourth section makes all laws relative to school matters, not inconsistent with the provisions of the act, applicable to colored schools.

It is, in the first place, claimed that the act of May 13th, 1869, is in conflict with section 19 of article 4 of our constitution, which provides, that every act shall " embrace but one subject and matters properly connected therewith; which subject shall be expressed in the title."

We think the subject of the act is common schools, and that the taxation of the property of all persons for school purposes and the enumeration of, and providing schools for, the colored children of the State are properly connected with the subject of the act. We have so frequently placed a construction upon the above quoted section that we do not deem it necessary to re-examine the question. We cite the late case of *The State,*

*ex rel. Pitman,* v. *Tucker,* 46 Ind. 355, where many of the cases are cited.

It is very plain and obvious to us, that by the supplemental act of May 13th, 1869, the legislature has provided for the education of the white and colored children of the State in separate schools, and the question presented for our decision is, whether such legislation is in conflict with the constitution of this State or the Constitution of the United States.

It is contended that the act in question is repugnant to section 23 of article 1, and section 1 of article 8, and they are: "Section 23. The General Assembly shall not grant to any citizen, or class of citizens, privileges or immunities which, upon the same terms, shall not equally belong to all citizens." 1 G. & H. 33.

Section 1, article 8 (1 G. & H. 48), declares, that "knowledge and learning, generally diffused throughout a community, being essential to the preservation of a free government, it shall be the duty of the General Assembly to encourage, by all suitable means, moral, intellectual, scientific, and agricultural improvement; and to provide by law for a general and uniform system of common schools, wherein tuition shall be without charge, and equally open to all."

It is important that we should settle in advance the rules by which we are to be guided in placing a construction upon the constitutional provisions above quoted.

In *The State* v. *Gibson,* 36 Ind. 389, we held that it was settled by very high authority, that, in placing a construction upon a written constitution or any clause or part thereof, a court should look to the history of the times, and examine the state of things existing when the constitution, or any part thereof, was framed and adopted, to ascertain the old law, the mischief, and the remedy. The court should also look to the nature and objects of the particular powers, duties, and rights in question, with all the aids and lights of cotemporary history, and give to the words of each provision just such operation and force, consistent with their legitimate meaning, as will fairly secure the end proposed. *Kendall* v. *The United*

*States,* 12 Peters, 524; *Prigg* v. *The Commonwealth of Pennsylvania,* 16 Peters, 539.

In the *Slaughter-House Cases,* 16 Wallace, 36, the same rules were laid down and illustrated with great force by reference to the history of the times and condition of things which brought about the recent amendments to the Constitution of the United States.

Judge COOLEY, in his great work on Constitutional Limitations, on page 54, says:

"A cardinal rule in dealing with written instruments is that they are to receive an unvarying interpretation, and that their practical construction is to be uniform. A constitution is not to be made to mean one thing at one time, and another at some subsequent time when the circumstances may have so changed as perhaps to make a different rule in the case seem desirable. A principal share of the benefit expected from written constitutions would be lost if the rules they established were so flexible as to bend to circumstances or be modified by public opinion. It is with special reference to the varying moods of public opinion, and with a view to putting the fundamentals of government beyond their control, that these instruments are framed; and there can be no such steady and imperceptible change in their rules as inheres in the principles of the common law. Those beneficent maxims of the common law which guard person and property have grown and expanded until they mean vastly more to us than they did to our ancestors, and are more minute, particular, and pervading in their protections; and we may confidently look forward in the future to still further modifications in the direction of improvement. Public sentiment and action effect such changes, and the courts recognize them; but a court or legislature which should allow a change in public sentiment to influence it in giving construction to a written constitution not warranted by the intention of its founders, would be justly chargeable with reckless disregard of official oath and public duty; and if its course could become a precedent, these instruments would be of little avail. The violence of public passion is quite as

likely to be in the direction of oppression as in any other; and the necessity for bills of rights in our fundamental laws lies mainly in the danger that the legislature will be influenced by temporary excitements and passions among the people to adopt oppressive enactments. What a court is to do, therefore, is to declare the law as written, leaving it to the people themselves to make such changes as new circumstances may require. The meaning of the constitution is fixed when it is adopted, and it is not different at any subsequent time when a court has occasion to pass upon it."

Again, the learned author says:

" The object of construction, as applied to a written constitution, is to give effect to the intent of the people in adopting it. In the case of all written laws, it is the intent of the lawgiver that is to be enforced."

Another cardinal rule of construction laid down by this author is, that the whole instrument is to be examined in placing a construction upon any portion or clause thereof. He says :

" Nor is it lightly to be inferred that any portion of a written law is so ambiguous as to require extrinsic aid in its construction. Every such instrument is adopted as a whole, and a clause which, standing by itself, might seem of doubtful import, may yet be made plain by comparison with other clauses or portions of the same law. It is therefore a rule of construction, that the whole is to be examined with a view to arriving at the true intention of each part; and this Sir Edward Coke regards the most natural and genuine method of expounding a statute. ' If any section [of a law] be intricate, obscure, or doubtful, the proper mode of discovering its true meaning is by comparing it with the other sections, and finding out the sense of one clause by the words or obvious intent of another.' And in making this comparison it is not to be supposed that any words have been employed without occasion, or without intent that they should have effect as part of the law. The rule applicable here is, that effect is to be given, if possible, to the whole instrument, and to every sec-

tion and clause. If different portions seem to conflict, the courts must harmonize them, if practicable, and lean in favor of a construction which will render every word operative, rather than one which may make some idle and nugatory.

" This rule is especially applicable to written constitutions, in which the people will be presumed to have expressed themselves in careful and measured terms, corresponding with the immense importance of the powers delegated, leaving as little as possible to implication. It is scarcely conceivable that a case can arise where a court would be justifiable in declaring any portion of a written constitution nugatory because of ambiguity. One part may qualify another, so as to restrict its operation, or apply it otherwise than the natural construction would require if it stood by itself; but one part is not to be allowed to defeat another, if by any reasonable construction the two can be made to stand together."

In support of the above propositions, reference is made in the notes to the following authorities :

*The People* v. *Morrell,* 21 Wend. 563 ; *Newell* v. *The People,* 7 N. Y. 109 ; *McKoan* v. *Devries,* 3 Barb. 196 ; *The People* v. *Blodgett,* 13 Mich. 138 ; *United States* v. *Fisher,* 2 Cranch, 399 ; *Bosley* v. *Mattingly,* 14 B. Mon. 89 ; *Sturges* v. *Crowninshield,* 4 Wheat. 202 ; *Schooner Paulina's Cargo* v. *United States,* 7 Cranch, 60 ; *Ogden* v. *Strong,* 2 Paine C. C. 584 ; *United States* v. *Ragsdale,* Hemp. 497 ; *Southwark Bank* v. *The Commonwealth,* 26 Penn. St. 446 ; *Ingalls* v. *Cole,* 47 Me. 530 ; *McCluskey* v. *Cromwell,* 11 N. Y. 593 ; *Furman* v. *City of New York,* 5 Sandf. 16 ; *The People* v. *The New York Central R. R. Co.,* 24 N. Y. 492 ; *Bidwell* v. *Whitaker,* 1 Mich. 479 ; *Alexander* v. *Worthington,* 5 Md. 471 ; *Cantwell* v. *Owens,* 14 Md. 215 ; *Case* v. *Wildridge,* 4 Ind. 51 ; *Pitman* v. *Flint,* 10 Pick. 504 ; *Ludlow* v. *Johnson,* 3 Ohio, 553 ; *District Township* v. *The City of Dubuque,* 7 Iowa, 262 ; *Pattison* v. *Board, etc.,* 13 Cal. 175 ; *Spencer* v. *The State,* 5 Ind. 41 ; *Denn* v. *Reid,* 10 Pet. 524 ; *Greencastle Township, etc.,* v. *Black,* 5 Ind. 569 ; *Stowell* v. *Lord Zouch,* Plow. 365 ; Broom Leg. Max. (5th Am. ed.) 551 ; Co. Lit.

381, *a.; Attorney General* v. *Detroit, etc., Plank Road Co.,* 2 Mich. 138; *The People* v. *Burns,* 5 Mich. 114; *Manly* v. *The State,* 7 Md. 135; *Parkinson* v. *The State,* 14 Md. 184; *The Belleville, etc., R. R. Co.* v. *Gregory,* 15 Ill. 20; *Ryegate* v. *Wardsboro,* 30 Vt. 746; *Brooks* v. *Mobile School Comm'rs,* 31 Ala. 229; *Den* v. *Dubois,* 1 Harrison, 285; *Den* v. *Schenck,* 3 Halst. 34; *Wolcott* v. *Wigton,* 7 Ind. 44; *The People* v. *Purdy,* 2 Hill N. Y. 36; *Green* v. *Weller,* 32 Miss. 650; *Warren* v. *Shuman,* 5 Texas, 441; *Quick* v. *White Water Township,* 7 Ind. 570; *Gibbons* v. *Ogden,* 9 Wheat. 188; Smith Const. Construc., secs. 502, 503; Sedgw. Stat. Law, 229, 233, 251, and 252.

An examination of the above authorities shows that they are in point, and fully support the doctrines announced.

It is essential to a correct interpretation of the above provisions of our constitution, in the light of the above rules of construction, that we should look to the history of the times and examine the condition of things existing prior to, and at the time of, the adoption and ratification of our present state constitution, and compare the sections in question with other portions and clauses of such constitution.

We will limit our inquiry into the political condition of the negroes in this State from the organization of our state government in 1816 down to the ratification of the thirteenth, fourteenth, and fifteenth amendments to the Constitution of the United States, and incidentally to their status in other states of the Union.

Prior to the act of May 13th, 1869, making taxation for common school purposes uniform, and providing for the education of the colored children of the State, 3 Ind. Stat. 472, no provision was made for their education in this State. As a race, their condition was one of marked and settled inferiority before the law, being reduced strictly to the enjoyment of the three primary rights only, and for a large portion of time legally precluded from their full exercise, viz., the right of personal security, the right of personal liberty, and the right of private property. But the power of exercising these rights was practically limited in degree as compared with the exercise and

enjoyment of the same rights by the white race. This was their most-favorable condition in several states of the Union, they being admitted to the equal exercise of civil and political rights and privileges with the whites in but one state of the Union. In nearly one-half of the states of the Union, as a race, they lived in a state of life-long servitude, having no control of their time or actions, no right to acquire property, no lawful power to follow the promptings of their own thoughts and judgments, their lives and limbs, their minds and strength, the property and subject to the will of their masters; and notwithstanding the proclamation of emancipation, this continued to be their condition, practically and in a large degree, until after the ratification of the thirteenth amendment to the Constitution of the United States, December 18th, 1865. 2 Kent Com., 7th ed., pp. 252, 258, and note *b* to p. 258; *Scott* v. *Sandford,* 19 How. 393; *Smith* v. *Moody,* 26 Ind. 299; Rev. Stat. 1831, p. 375; Rev. Stat. 1838, p. 418.

By sec. 7 of article 11 of the constitution of 1816, it is provided that there shall be neither slavery nor involuntary servitude in this State, otherwise than for the punishment of crimes, whereof the party shall have been duly convicted. Rev. Stat. 1838, p. 50.

Sec. 2 of article 3 provided for an enumeration of all the white male inhabitants above the age of twenty-one years. Rev. Stat. 1838, p. 38.

Sec. 1 of article 6 limited the right of suffrage to the white male citizens of the United States of the age of twenty-one, and who had resided in the State one year immediately preceding the election. Rev. Stat. 1838, p. 46.

By the act of February 10th, 1831, every such person, coming into or being brought into this State, was prohibited from residing therein, unless bond with good and sufficient security, to be approved by the overseers of the poor of some township, was given on behalf of such person, payable to the State of Indiana, in the penal sum of five hundred dollars, conditioned that such person should not, at any time, become

a charge to the county in which such bond was given, nor to any other county in the State, as also for such person's good behavior, etc.

It provided penalties, likewise, for failure to comply with these provisions, consisting of hiring such person out and applying the proceeds to his benefit, and removal from the State; and by fine imposed and recovered by presentment or indictment, for harboring any such person failing to give the required bond.

This act remained upon the statute book of this State, and continued in force, for a period of over twelve years, and received the judicial sanction of the Supreme Court of the State. Rev. Stat. 1831, pp. 375, 376; Rev. Stat. 1838, pp. 418, 419; *The State* v. *Cooper*, 5 Blackf. 258; *Baptiste* v. *The State*, 5 Blackf. 283; *Hickland* v. *The State*, 8 Blackf. 365.

Article 13 of the constitution of this State, which took effect on the 1st day of November, 1851, and superseded the constitution of 1816, prohibited negroes and mulattoes from coming into or settling in this State after its adoption, declared all contracts with such persons void, and made it an offence punishable by fine of not less than ten nor more than five hundred dollars for any person to employ them; and this article was submitted, as a distinct proposition, to the people of the State for their approval or disapproval, and was adopted by a vote of one hundred and nine thousand nine hundred and seventy-six to twenty-one thousand and sixty-six. 1 G. & H. 52; Dillon's Hist. Ind. 577.

Other provisions of this constitution excluded negroes and mulattoes from the elective franchise, from holding office in the State or any of its departments, from the enumeration for senatorial and representative purposes, and from participation in all of the privileges pertaining to full and active citizenship, making them a separate and distinct class of inferiors before the law, and placing them politically in a separate body, with no constitutional grant of privileges and immunities under the title of " citizen " or " citizens," but leaving them in possession only of the three primary rights heretofore

mentioned. 1 Opin. Att'y Gen. 506 ; 4 Opin. Att'y Gen. 147 ; *Smith* v. *Moody*, 26 Ind. 299.

This the constitution and subsequent recognized and decided constitutional legislation clearly establish. Acts June 18th, 1852, 1 G. & H. 443; *Hatwood* v. *The State*, 18 Ind. 492 ; *Barkshire* v. *The State*, 7 Ind. 389.

In the light of the foregoing history, constitutional provisions, legislative acts, and judicial constructions thereof, it is very plain and obvious to us, that persons of the African race were not in the minds or contemplation of the wise and thoughtful framers of our constitution, when they prepared and agreed upon the above quoted sections, or of the people of the State when they ratified and adopted the constitution containing such provisions.

In our opinion, the privileges and immunities secured by sec. 23 of article 1 were not intended for persons of the African race; for the section expressly limits the enjoyment of such privileges and immunities to citizens, and at that time negroes were neither citizens of the United States nor of this State. It was held by this court, in *Sears* v. *The Board of Commissioners of Warren County*, 36 Ind. 267, that the privileges and immunities secured by the above quoted section were intended for citizens of this State.

Nor in view of the other provisions of our constitution, and in the light of the rules of construction before stated, can it be successfully maintained that the provisions of sec. 1 of article 8 were intended ·for the children of the African race. It is unreasonable to suppose that·the framers of the constitution, who had denied to that race the right of citizenship, of suffrage, of holding office, of serving on juries, and of testifying as witnesses in any case where a white person was a party, and had prohibited, under heavy pains and penalties, the further immigration of that race into the State, intended to provide for the education of the children of that race in our common schools with the white children of the State.

The public sentiment of the State, at that time, was unfriendly to the African race and their participation in gov-

ernmental affairs, and demanded their exclusion from the State; and it is not for us to say, sitting here, whether such policy was wise or unwise, and we speak of it only as a matter of history having a bearing upon the construction of our constitution.

An application of the rules of construction heretofore laid down to the various provisions of our constitution will conclusively demonstrate that the provisions of the sections under examination have no application to the children and grandchildren of the appellee.

One of the cardinal rules of construction is, that courts shall give effect to the intent of the framers of the instrument, and of the people in adopting it. Then, as it is manifest that neither the framers of the constitution nor the people in adopting it intended that the children of the African race should participate in the advantages of a general and uniform system of common schools, we possess no power to adjudge to them what was not designed for them.

Another rule of construction is, that in placing a construction upon one section or clause, courts are required to examine the whole instrument and to give effect, if possible, to the whole instrument; and if different portions seem to conflict, the courts must harmonize them, if practicable, and lean in favor of a construction which will render every word operative, rather than one which may make some idle and nugatory. There is but one construction which will preserve the unity, harmony, and consistency of our state constitution, and that is, to hold that it was made and adopted by and for the exclusive use and enjoyment of the white race. Any other construction would convict the members of the constitutional convention and the voters of the State of the grossest inconsistency, absurdity, and injustice. It would be monstrous to hold that the framers of the constitution in adopting, and the voters of the State in ratifying it, intended that the common schools of the State should be open to the children of the African race, when, by the same instrument, that portion of such race as then resided in the State were denied all political rights, priv-

ileges, and immunities, and the further immigration of that race into the State was prohibited by the thirteenth article of the constitution, which received the almost unanimous approval of the voters of the State.

Another important rule of construction is, that the meaning of a constitution is fixed when it is adopted, and it is not different at any subsequent time when a court has occasion to pass upon it. A constitution is inflexible and can not bend to circumstances or be modified by public opinion. It is, therefore, the duty of the court to declare the law as it is written, leaving to the people, in their sovereign capacity, to make such changes as new circumstances may require; and, in our opinion, using the appropriate and forcible language of Judge COOLEY, "a court or legislature which should allow a change in public sentiment to influence it in giving construction to a written constitution not warranted by the intention of its founders, would be justly chargeable with reckless disregard of official oath and public duty."

The views which we have expressed are greatly strengthened and enforced by the construction which this court placed upon a section of the constitution of 1816, and of an act passed while it was in force.

Section 1 of article 9 declares that "knowledge and learning, generally diffused through a community, being essential to the preservation of a free government, and spreading the opportunities and advantages of education through the various parts of the country being highly conducive to this end," etc. "the General Assembly shall, from time to time, pass such laws as shall be calculated to encourage intellectual, scientifical, and agricultural improvement, by allowing rewards and immunities for the promotion and improvement of arts, sciences, commerce, manufactures, and natural history; and to countenance and encourage the principles of humanity, industry, and morality."

Section 2 of said article provided, that "it shall be the duty of the General Assembly, as soon as circumstances will permit, to provide by law for a general system of education

ascending in a regular gradation from township schools to a state university, wherein tuition shall be gratis, and equally open to all." R. S. 1838, pp. 48, 49.

While the above constitution was in force, the legislature provided for a general common school system, the 102d section of which act was as follows:

"When any school is supported in any degree by the public school fund, or by taxation, so long as the money so derived shall be expending thereon, such school shall be open and free to all the white children resident within the district, over five and under twenty-one years of age." Chap. 15, R. S. 1843, p. 321.

In the case of *Lewis* v. *Henley*, 2 Ind. 332, this court was required to place a construction upon the above quoted section, and it was held that negro children were not entitled to admission to the schools with the white children, and that the legislature had the right, under the constitution, to exclude negro children from our public schools. It was further held that, although the negroes might be entitled to share in the funds derived from the sale of lands donated by Congress, yet they would have to do so in separate schools, and not in schools with white children.

Both constitutions provided for a general and uniform system of common schools; both provided that the tuition should be free and the schools equally open to all. Both constitutions deprived the negroes of all political rights. If the legislature, under the constitution of 1816, had the right to exclude the negroes from the public schools for white children, it is difficult to see why it may not be done under the present constitution.

Having reached the true construction of the constitution of this State, as it came from the hands of its framers and received the sanction of her qualified voters, the next step is to find out the extent of its qualification or change by the Constitution of the United States.

Section 2 of article 4 of the Constitution of the United States declares, that " the citizens of each state shall be enti-

tled to all privileges and immunities of citizens in the several states."

This section, at an early date, received a construction in the case of *Corfield* v. *Coryell*, which has ever since been recognized and approved. It relates only to "those privileges and immunities which are fundamental," and which may all be comprehended under the following heads : " Protection by the government, with the right to acquire and possess property of every kind, and to pursue and obtain happiness and safety, subject, nevertheless, to such restraints as the government may prescribe for the general good of the whole."

In the *Slaughter-House Cases*, the Supreme Court of the United States said : " Its sole purpose was to declare to the several states, that whatever those rights, as you grant or establish them to your own citizens, or as you limit or qualify, or impose restrictions on their exercise, the same, neither more nor less, shall be the measure of the rights of citizens of other states within your jurisdiction." It did not compel the state, into which the citizen of another state removed, to allow him the exercise of the same rights which he enjoyed in the state from which he removed. *Corfield* v. *Coryell*, 4 Wash. C. C. 371 ; *Slaughter-House Cases*, 16 Wal. 76, 77 ; *Bradwell* v. *The State*, 16 Wal. 130 ; *Ward* v. *Maryland*, 12 Wal. 430 ; *Conner* v. *Elliott*, 18 How. 591 ; *Brown* v. *State of Md.*, 12 Wheat. 448, 449 ; *People* v. *Brady*, 40 Cal. 198 ; Story Const., secs. 1805, 1806 ; Cooley Const. Lim. 15, 16, 397 ; Potter's Dwarris on Stat. 525, 526 ; *Sears* v. *The Board, etc.*, 36 Ind. 267 ; *The Jeffersonville, etc., R. R. Co.* v. *Hendricks*, 41 Ind. 48.

It is well settled by repeated decisions of the federal and state courts, that with the exception of the limitations imposed upon the powers of the states by section 10 of article 1 of the Constitution of the United States, the several states were left as before the Federal Union was formed, with full power to declare the rights of their citizens, without interference from the Federal Government.

It is a familiar rule of construction of the Constitution of the Union, that the sovereign powers vested in the state gov-

Cory *et al. v.* Carter.

vernments by their respective constitutions, remain unaltered and unimpaired, except so far as they were granted to the government of the United States. In one of the states of the Union, colored children were entitled to admission into schools for white children, and to be taught with white children, and yet, if a person residing in such state should remove into some other state, where such right is denied, the right so exercised in the state from which the person removed would be lost, because it was not one of those fundamental rights which accompany the person, but a domestic regulation exclusively within the constitutional and legislative power of each state, and to be regarded in the nature of a domestic regulation necessary for the good of the whole people, or which the good of the people of one state, in their sovereign judgment, required to be different from the regulation in another, as best securing "the general comfort and prosperity of the state." Story Const., secs. 1353, 1409 ; Cooley Const. Lim. 573, 574 ; 2 Kent Com. 71 ; 2 Op. Att'y Gen'l, 426 ; *Commonwealth* v. *Alger,* 7 Cush. 84 ; *The City of New York* v. *Miln,* 11 Pet. 139 ; *Slaughter-House Cases,* 16 Wal. 62 ; *Bradwell* v. *The State,* 16 Wal. 130 ; *Thayer* v. *Hedges,* 22 Ind. 282 ; Potter's Dwarris on Stat. 352, 452, 455, 461.

It is very plain that the tenth amendment of the Constitution of the United States cannot receive such construction as will aid the claim of the appellee. It declares, that "the powers not delegated to the United States by the Constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people ;" and the power to fix the qualifications of the citizen of the state, and to establish his rights in the state, is one of the powers expressly reserved to the state by this amendment ; for there is no express limitation of the power of the states in the Federal Constitution in this respect, as it then stood, and such limitation could not exist without express mention. Rawle Const. 84, 87 ; Story Const., sec. 1904 ; Works of Webster, vol. 3, p. 322 ; Cooley Const. Lim. 19 ; Federalist, 140 ; *Slaughter-House Cases,* 16 Wal. 70, 71, 72, 73 ; *Barron* v. *Mayor, etc.,* 7 Pet. 243 ; *Smith* v. *State of Md.,*

Cory *et al. v.* Carter.

18 How. 71 ; *Pervear* v. *The Commonwealth,* 5 Wal. 475 ; *Barker* v. *The People,* 3 Cow. 686 ; *James* v. *The Commonwealth,* 12 S. & R. 220 ; *Jane* v. *Commonwealth,* 3 Met. Ky. 18 ; *Lincoln* v. *Smith,* 27 Vt. 336 ; *Warren* v. *Paul,* 22 Ind. 276 ; *The State, ex rel. Lakey,* v. *Garton,* 32 Ind. 1.

That the views hereinbefore expressed correctly represent the relative powers of the federal and state governments at the close of the great civil war, and until after the ratification of the amendments to the Constitution of the United States, which followed the termination of that contest, cannot, we think, be successfully controverted.

We next proceed to determine whether such amendments, or either of them, have worked a change, and, if they have, to what extent.

The thirteenth amendment was proposed by Congress on the 1st day of February, 1865, and declared by the Secretary of State to have been ratified December 18th, 1865. It declares that " neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction ;" and " Congress shall have power to enforce this article by appropriate legislation." 3 Ind Stat. 579.

This amendment was to prevent any question in the future as to the effect of the war and the President's proclamation of emancipation upon slavery ; and its obvious purpose was to forbid all shades and conditions of African slavery. *Slaughter-House Cases,* 16 Wal. 68, 69.

It had no other office, and its real effect was more for the future than the present. As to the matter of social and political rights, the African was left just where section 37, article 1, of our state constitution left him, and subject to all the inconveniences and burdens incident to his color and race, except his former one of servitude. He was a person whose place and office, in the body politic, was yet to be designated and established. He possessed no political rights, in the usual and

proper sense of that term, through, or had none conferred by, this enactment.

Following this constitutional amendment, the civil rights bill of April 9th, 1866, was enacted by Congress, the first section of which declares who are citizens of the United States, and specifies certain rights which shall be accorded to such citizens in the states and territories, and the residue is made up of pains and penalties for violation of the rights sought to be conferred, and the machinery for enforcing its provisions.

It is not worth while to enquire into the effect of this act, or whether the Federal Constitution, which made citizens of the different states citizens of the United States, could be changed by a simple congressional enactment; for it is clear, admitting it to be valid, that it does not relate to or bear upon the right claimed in this case, for it purports only to confer upon negroes and mulattoes the right, in every state and territory, to make and enforce contracts, to sue, be parties and give evidence, to inherit, purchase, lease, sell, hold, and convey real and personal property, and the full and equal benefit of all laws and proceedings for the security of person and property as enjoyed by white citizens, and subjects them to like pains and penalties. 3 Ind. Stat. 589. In this nothing is left to inference. Every right intended is specified.

The fourteenth amendment to the Federal Constitution was proposed by Congress July 16th, 1866, and declared by the Secretary of State to have been ratified July 28th, 1868. It consists of several sections, but section 1 is the only one necessary to this examination. It declares, that " all persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws."

This section can better be understood or construed, by dividing and considering it in four paragraphs or clauses, the last, however, being a mere re-statement of what precedes it:

First. " All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside."

In the *Slaughter-House Cases,* the Supreme Court of the United States say, this is a declaration " that persons may be citizens of the United States without regard to their citizenship of a particular state, and it overturns the Dred Scott decision by making all persons born within the United States and subject to its jurisdiction citizens of the United States. That its main purpose was to establish the citizenship of the negro can admit of no doubt. The phrase, ' subject to its jurisdiction,' was intended to exclude from its operation children of ministers, consuls, and citizens or subjects of foreign states born within the United States." It recognizes and establishes a " distinction between citizenship of the United States and citizenship of a state." " Not only may a man be a citizen of the United States without being a citizen of a state, but an important element is necessary to convert the former into the latter. He must reside within the state to make him a citizen of it, but it is only necessary that he should be born or naturalized in the United States to be a citizen of the Union. It is quite clear, then, that there is a citizenship of the United States, and a citizenship of a state, which are distinct from each other, and which depend upon different characteristics or circumstances in the individual." Hence, a negro may be a citizen of the United States and reside without its territorial limits, or within some one of the territories; but he cannot be a citizen of a state until he becomes a *bona fide* resident of the state.

Second. " No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States."

This clause does not refer to citizens of the states. It

embraces only citizens of the United States. It leaves out the words " citizen of the state," which is so carefully used, and used in contradistinction to citizens of the United States, in the preceding sentence. It places the privileges and immunities of citizens of the United States under the protection of the Federal Constitution, and leaves the privileges and immunities of citizens of a state under the protection of the state constitution. This is fully shown by the recent decision of the Supreme Court of the United States in the *Slaughter-House Cases*, 16 Wal. 36.

Mr. Justice MILLER, in delivering the opinion of the court and in speaking in reference to the clause under examination, says:

" It is a little remarkable, if this clause was intended as a protection to the citizen of a state against the legislative power of his own state, that the word citizen of the state should be left out when it is so carefully used, and used in contradistinction to citizens of the United States, in the very sentence which precedes it. It is too clear for argument that the change in phraseology was adopted understandingly and with a purpose.

" Of the privileges and immunities of the citizen of the United States, and of the privileges and immunities of the citizen of the state, and what they respectively are, we will presently consider; but we wish to state here that it is only the former which are placed by this clause under the protection of the Federal Constitution, and that the latter, whatever they may be, are not intended to have any additional protection by this paragraph of the amendment.

" If, then, there is a difference between the privileges and immunities belonging to a citizen of the United States as such, and those belonging to the citizen of the state as such, the latter must rest for their security and protection where they have heretofore rested; for they are not embraced by this paragraph of the amendment."

The same learned judge, in the further examination of the second clause, says:

" It would be the vainest show of learning to attempt to prove by citations of authority, that up to the adoption of the recent amendments, no claim or pretence was set up that those rights depended on the Federal Government for their existence or protection, beyond the very few express limitations which the Federal Constitution imposed upon the states—such, for instance, as the prohibition against *ex post facto* laws, bills of attainder, and laws impairing the obligation of contracts. But with the exception of these and a few other restrictions, the entire domain of the privileges and immunities of citizens of the states, as above defined, lay within the constitutional and legislative power of the states, and without that of the Federal Government. Was it the purpose of the fourteenth amendment, by the simple declaration that no state should make or enforce any law which shall abridge the privileges and immunities of citizens of the United States, to transfer the security and protection of all the civil rights which we have mentioned, from the states to the Federal Government ? And where it is declared that Congress shall have the power to enforce that article, was it intended to bring within the power of Congress the entire domain of civil rights heretofore belonging exclusively to the states?

" All this and more must follow, if the proposition of the plaintiffs in error be sound. For not only are these rights subject to the control of Congress whenever in its discretion. any of them are supposed to be abridged by state legislation, but that body may also pass laws in advance, limiting and restricting the legislative power of the states, in their most ordinary and usual functions, as in its judgment it may think proper on all such subjects. And still further, such a construction followed by the reversal of the judgments of the Supreme Court of Louisiana in these cases" (these judgments sustained the validity of the grant, by the legislature of Louisiana, of an exclusive right, guarded by certain limitations as to price, etc., to a corporation created by it, for twenty-five years, to build and maintain slaughter-houses, etc., and prohibited the right to all others, within a certain locality),

" would constitute this court a perpetual censor upon all legislation of the states, on the civil rights of their own citizens,. with authority to nullify such as it did not approve as consistent with those rights, as they existed at the time of the adoption of this amendment.

" The argument we admit is not always the most conclusive which is drawn from the consequences urged against the adoption of a particular construction of an instrument. But when, as in the case before us, these consequences are so serious, so far-reaching and pervading, so great a departure from the structure and spirit of our institutions; when the effect is to fetter and degrade the state governments by subjecting them to the control of Congress, in the exercise of powers heretofore universally conceded to them of the most ordinary and fundamental character; when in fact it radically changes the whole theory of the relations of the state and Federal Governments to each other and of both these governments to the people; the argument has a force that is irresistible, in the absence of language which expresses such a purpose too clearly to admit of doubt. We are convinced that no such results. were intended by the Congress which proposed these amendments, nor by the legislatures of the states which ratified them."

Third. " Nor shall any state deprive any person of life, liberty, or property, without due process of law."

This clause is the same contained in the fifth amendment to the Constitution of the United States, but there applied to the action of the Federal Government, and here placed as a check upon the states. But the constitution of our State contains, and perhaps those of all the states contain just such a provision, so that it expresses no new principle, but is the old rule in force since the foundation of the state governments. It prohibits the states from depriving any person of life, liberty, or property, except " in due course of legal proceedings, according to those rules and forms which have been established " by the state, " for the protection of private rights." Cooley Const. Lim. 356, 357; *Westervelt* v. *Gregg,* 12 N. Y. 209.

Fourth. " Nor deny to any person within its jurisdiction the equal protection of the laws."

In regard to this clause, the Supreme Court of this State, in *The State* v. *Gibson,* 36 Ind. 389, say, it " seems to have been added in the abundance of caution, for it provides in express terms what was the fair, logical, and just implication from what had preceded it, and that was, that the persons made cit- izens by the amendment should be protected by the laws in the same manner, and to the same extent, that white citizens were protected."

In the case of *The State* v. *Gibson, supra,* this court was called upon to place a construction upon the fourteenth amend- ment to the Constitution of the United States. It was claimed in that case, that such amendment had abolished the laws of this State prohibiting the intermarriage of negroes and whites. We held that marriage was a purely domestic institution, and subject to the exclusive control of the State; that such amend- ment had not conferred on the Federal Government any power to interfere with the institution of marriage, and that such amendment had not enlarged the powers of the Federal Gov- ernment nor diminished those of the states. We then said:

" The fourteenth amendment contains no new grant of power from the people, who are the inherent possessors of all power, to the Federal Government. It did not enlarge the powers of the Federal Government, nor diminish those of the states. The inhibitions against the states doing certain things have no force or effect. They do not prohibit the states from doing any act that they could have done without them. * * * The only effect of the amendment under consideration was to extend the protection and blessings of the constitution and laws to a new class of persons. When they were made citi- zens they were as much entitled to the protection of the con- stitution and the laws as were the white citizens, and the states could no more deprive them of privileges and immunities than they could citizens of the white race. Citizenship entitled them to the protection of life, liberty, and property, and the

full and equal protection of the laws. Nor has the ratification of this amendment in any manner or to any extent impaired, weakened, or taken away any of the reserved rights of the states, as they had existed and been fully recognized by every department of the national government from its creation."

What was then intended to be expressed was, that the fourteenth amendment had not delegated to the Federal Government the power to regulate and control the domestic institutions of a state. As will be hereinafter shown, it imposes some limitations upon the powers of the states as to slavery and the equal protection of the rights of citizen of the United States and of the states.

We were then unaided by any judicial construction of the fourteenth amendment; and we are gratified to know that the views then expressed have been, in all substantial respects, sustained by the highest judicial tribunal in this country, and the one especially charged with the construction and interpretation of the Federal Constitution. By the solemn decision of that high court, the privileges and immunities belonging to the citizens of the states, as such, rest for their security and protection where they have heretofore rested, with the states themselves.

In *The State, ex rel. Garnes,* v. *McCann,* 21 Ohio St. 198, the Supreme Court of that state uses the following language:

"It would seem, then, that under the constitution and laws of this state, the right to classify the youth of the state for school purposes, on the basis of color, and to assign them to separate schools for education, both upon well recognized legal principles and the repeated adjudications of this court, is too firmly established to be now judicially disturbed.

"But it is claimed that the law authorizing the classification in question contravenes the provisions of the fourteenth amendment of the Constitution of the United States, and is, therefore, abrogated thereby.

"Unquestionably all doubts, whersoever they existed, as to the citizenship of colored persons, and their right to the 'equal protection of the laws,' are settled by this amendment.

But neither of these was denied to them in this state before the adoption of the amendment. At all events, the statutes classifying the youth of the state for school purposes on the basis of color, and the decisions of this court in relation thereto, were not at all based on a denial that colored persons were citizens, or that they are entitled to the equal protection of the laws. It would seem, then, that these provisions of the amendment contain nothing conflicting with the statute authorizing the classification in question, nor the decisions heretofore made touching the point in controversy in this case. Nor do we understand that the contrary is claimed by counsel in this case. But the clause relied on, in behalf of the plaintiff, is that which forbids any state to 'make or enforce any law which will abridge the privileges or immunities of citizens of the United States.'

" This involves the inquiry as to what privileges or immunities are embraced in the inhibition of this clause. We are not aware that this has been as yet judicially settled. The language of the clause, however, taken in connection with other provisions of the amendment, and of the constitution of which it forms a part, affords strong reasons for believing that it includes only such privileges or immunities as are derived from, or recognized by, the Constitution of the United States.

"A broader interpretation opens into a field of conjecture limitless as the range of speculative theories, and might work such limitations of the power of the states to manage and regulate their local institutions and affairs as were never contemplated by the amendment.

" If this construction be correct, the clause has no application to this case, for all the privileges of the school system of this state are derived solely from the constitution and laws of the state. If the General Assembly should pass a law repealing all laws creating and regulating the system, it can not be claimed that the fourteenth amendment could be interposed to prevent so grievious an abridgment of the privileges of the citizens of the state, for they would thereby be deprived of

privileges derived from the state, and not of privileges derived from the United States.

" But we need not now further discuss this point, as the true meaning and exact limits of the clause in question are not necessarily involved in this case. For, conceding that the fourteenth amendment not only provides equal securities for all, but guarantees equality of rights to the citizens of a state, as one of the privileges of citizens of the United States, it remains to be seen whether this privilege has been abridged in the case before us. The law in question surely does not attempt to deprive colored persons of any rights. On the contrary, it recognizes their right, under the constitution of the state, to equal common school advantages, and secures to them their equal proportion of the school fund. It only regulates the mode and manner in which this right shall be enjoyed by all classes of persons. The regulation of this right arises from the necessity of the case. Undoubtedly it should be done in a manner to promote the best interests of all. But this task must, of necessity, be left to the wisdom and discretion of some proper authority. The people have committed it to the General Assembly, and the presumption is that it has discharged its duty in accordance with the best interests of all. At all events, the legislative action is conclusive, unless it clearly infringes the provisions of the constitution.

"At most, the fourteenth amendment only affords to colored citizens an additional guaranty of equality of rights to that already secured by the constitution of the state.

" The question, therefore, under consideration is the same that has, as we have seen, been heretofore determined in this state, that a classification of the youth of the state for school purposes, upon any basis which does not exclude either class from equal school advantages, is no infringement of the equal rights of citizens secured by the constitution of the state.

" We have seen that the law, in the case before us, works no substantial inequality of school privileges between the children of both classes in the locality of the parties. Under the

lawful regulation of equal educational privileges, the children of each class are required to attend the school provided for them, and to which they are assigned by those having the lawful official control of all.

"The plaintiff, then, can not claim that his privileges are abridged on the ground of inequality of school advantages for his children. Nor can he dictate where his children shall be instructed, or what teacher shall perform that office, without obtaining privileges not enjoyed by white citizens. Equality of rights does not involve the necessity of educating white and colored persons in the same school, any more than it does that of educating children of both sexes in the same school, or that different grades of scholars must be kept in the same school. Any classification which preserves substantially equal school advantages is not prohibited by either the state or Federal Constitution, nor would it contravene the provisions of either. There is, then, no ground upon which the plaintiff can claim that his rights under the fourteenth amendment have been infringed."

The foregoing opinion, having been rendered since the ratification of the fourteenth amendment, is directly in point, and is entitled to great weight and consideration, coming as it does from a court distinguished for its learning and ability.

How far, then, have the amendments operated to change the constitution of Indiana or imposed limitations or restrictions upon the sovereign power of the State? We answer, in the following particulars:

1. The State cannot in the future, while a member of the Federal Union, change her constitution so as to create or establish slavery or involuntary servitude, except as a punishment for crimes whereof the party shall have been convicted; thus protecting the new class of citizens, *i. e.*, negroes and mulattoes, from being again reduced to slavery.

2. The State cannot deny to, or deprive a citizen of the United States, *i. e.*, any negro or mulatto, of, those national rights, privileges, or immunities which belong to him as such citizen.

3. The State must recognize as its citizen any citizen of the United States, *i. e.*, any negro or mulatto, who is or becomes a *bona fide* resident therein.

4. The State must give to such, *i. e.*, to such negro or mulatto, who is or who becomes a *bona fide* resident therein, the same rights, privileges, and immunities, secured by her constitution and laws to her other, *i. e.*, to her white citizens.

In our opinion, such amendments have not in any other respect imposed restrictions or limitations upon the sovereign power of the State. From this it results, that there is no limitation upon the power of the State, within the limits of her own constitution, to fix, secure, and protect the rights, privileges, and immunities of her citizens, as such, of whatever race or color they may be, so as to secure her own internal peace, prosperity, and happiness.

This will preserve in their purity and vigor the structure and spirit of our complex system of government, as it came from the hands of the great and illustrious men who achieved our independence and formed our matchless form of government. Anterior to the adoption of the Federal Constitution, the states existed as independent sovereignties, possessing supreme and absolute power over all questions of local and internal government. To the states the whole charge of interior regulation is left by the Federal Constitution; to them and to the people thereof all powers not expressly, or by necessary implication, delegated to the national government, and not prohibited to the states, are reserved to the states.

The Constitution of the United States is the bond which binds the states in one federal union. It forms and provides the agencies for the continuance and management of the federal government. It relates to and concerns matters of national import, and enables the states, represented by their federal head, as one of the independent and most powerful governments of the world, to enter into and manage its relations with the other independent powers of the earth. Under our constitution, our common school system must be general. That is, it must extend over and embrace every portion of the State.

Cory *et al. v.* Carter.

It must be uniform. The uniformity required has reference to the mode of government and discipline, the branches of learning taught, and the qualifications as to age and advancement in learning required of pupils as conditions of their admission. It does not mean that all the schools shall be of the same size and grade, or that all the branches of learning taught in one school shall be taught in all other schools, or that the qualifications as to age and advancement, which would admit a pupil in one school, would entitle such pupil to admission into all the other schools. Uniformity will be secured when all the schools of the same grade have the same system of government and discipline, the same branches of learning taught, and the same qualifications for admission.

The schools must be "equally open to all." This has reference to the persons who are entitled to receive instruction therein. The phrase, "equally open to all," is not to be taken in a literal sense, for this would embrace the whole people of the State, the infant, the middle-aged, the septuagenarian, and the married.

It is very obvious, that the common schools of the State are neither to be equally open to everybody, nor to every child ; but that they are to be equally open to a class of persons, which class and their qualifications are to be designated and prescribed by the legislature.

The Federal Constitution does not provide for any general system of education, to be conducted and controlled by the national government, nor does it vest in Congress any power to exercise a general or special supervision over the states on the subject of education. The Constitution gives to Congress the power to dispose of and make all needful rules and regulations respecting the territories and other property belonging to the United States, and by virtue of this power territorial governments are organized. It also confers on Congress the exclusive power to legislate in all cases whatever over the District of Columbia, and by virtue of this power Congress has established in such District a system of common schools. Con-

has also established and maintained military and naval schools at the expense of the government.

The system of common schools in this State has its origin in, and is provided for by, the constitution and laws of this State. It is purely a domestic institution, and is subject to the exclusive control of the constituted authorities of the State. The constitution does not provide the machinery, nor lay down its rule of government or discipline, nor define the terms and conditions of admission. It makes it the imperative duty of the legislature to provide by law the system, and imposes no limitations on the power of the legislature, except that tuition shall be free, and the schools shall be equally open to all; that is, to such classes of persons as the legislature may, in its wisdom, determine.

There being no further restriction upon the legislative power and discretion, it necessarily follows, that in providing for this system of schools, the legislature is left free to fix the qualifications of pupils to be admitted to its benefits, as respects age and capacity to learn; to classify them with reference to age, sex, advancement, and the branches of learning they are to pursue; to provide for the location and building of schoolhouses; and to designate to what schools and in what schoolhouses the different ages, sexes, and degrees of proficiency shall be assigned; for these all concern the good order and success of the system.

It must also follow, that this policy or framework of government for that system vitally concerns and blends itself with the internal affairs of the State, with its happiness and prosperity, its peace and good order, and depends upon the wisdom of the legislature and of the agencies provided by the legislature, acting under its established rules, and comes within the power possessed by every sovereign state, and is clearly without the grants or inhibitions of such amendments to the Constitution of the United States. *City of New York* v. *Miln*, 11 Pet. 139, 140; *License Tax Cases*, 5 Wal. 470, 471; *Lane County* v. *Oregon*, 7 Wal. 76; *United States* v. *Dewitt*, 9 Wal. 41; *The Collector* v. *Day*, 11 Wal. 124, 125; *The Slaughter-*

Cory *et al. v.* Carter.

*House Cases, supra; Bartemeyer* v. *Iowa,* 18 Wal. 133 ; *The State* v. *Gibson,* 36 Ind. 389 ; *The West Chester, etc., R. R. Co.* v. *Miles,* 55 Pa. St. 209 ; Cooley Const. Lim. 572, 574; *Ellis* v. *The State,* 42 Ala. 525 ; *Fifield* v. *Close,* 15 Mich. 505.

This system of common schools must consist of many schools in different localities or geographical divisions; and these schools may be of different grades. In some of these localities or divisions there may be school-houses, and in others none. In some the school-house or houses may not be sufficient to accommodate all, and the revenue may not be sufficient to provide for them.

In this system, there ought to be and must be a classification of the children. This classification ought to and will be with reference to some properties or characteristics common to or possessed by a certain number out of the whole; and these classes may be put into and taught in different parts of the same school, or different rooms in the same school-house, or different school-houses, as convenience and good policy may require.

This is too reasonable to admit of question; for it concerns the general good, and does not affect the quality of the privilege, but regulates the manner of its enjoyment.

This being settled, what is there to prevent the classification of children, equally entitled to the privileges of the system of common schools, with reference to difference of race or color, if the judgment of the legislature should hold such a classification to be most promotive of, or conducive to, the good order and discipline of the schools in the system, and the interest of the public?

The legislature, under our state constitution as it existed without the limitation imposed upon the sovereign power of the State by the fourteenth amendment as hereinbefore stated, had the power to provide for the education only of the white children of the State; but since its ratification, no system of public schools would be general, uniform, and equally open to all which did not provide for the education of the colored children of the State.

It being settled that the legislature must provide for the education of the colored children as well as for the white children, we are required to determine whether the legislature may classify such children, by color and race, and provide for their education in separate schools, or whether they must attend the same school without reference to race or color. In our opinion, the classification of scholars, on the basis of race or color, and their education in separate schools, involve questions of domestic policy which are within the legislative discretion and control, and do not amount to an exclusion of either class. In other words, the placing of the white children of the State in one class and the negro children of the State in another class, and requiring these classes to be taught separately, provision being made for their education in the same branches, according to age, capacity, or advancement, with capable teachers, and to the extent of their *pro rata* share in the school revenue, does not amount to a denial of equal privileges to either, or conflict with the open character of the system required by the constitution. The system would be equally open to all. The tuition would be free. The privileges of the schools would be denied to none. The white children go to one school, or to certain of the schools in the system of common schools. The colored children go to another school, or to certain others of the schools in the system of the common schools. Or, if there are not a sufficient number of colored children within attending distance, the several districts may be consolidated and form one district. But if there are not a sufficient number within reasonable distance to be thus consolidated, the trustee or trustees shall provide such other means of education for said children as shall use their proportion, according to number, of school revenue to the best advantage. If there be cause of complaint, the white class has as much, if not greater cause than the colored class, for the latter class receive their full share of the school revenue, although none of it may have been contributed by such class; and when districts can not be consolidated so as to form a school, such class is entitled to receive their full share of the school revenue, according

to ·number, which shall be expended for their benefit to the best advantage, a privilege which is not granted to the white class.

In our opinion, there would be as much lawful reason for complaint, by one scholar in the same school, that he could not occupy the seat of another scholar therein at the same time the latter occupied it, or by scholars in the different classes in the same school, that they were not all put in the same class, or by the scholars in different schools, that they were not all placed in one school, as there is that white and black children are placed in distinct classes and taught separately, or in separate schools. *The State* v. *The City of Cincinnati,* 19 Ohio, 178; *Van Camp* v. *The Board, etc.,* 9 Ohio St. 406; *Baker* v. *The City of Cincinnati,* 11 Ohio St..534; *The State, etc.,* v. *McCann,* 21 Ohio St. 198; *Dallas* v. *Fosdick,* 40 How. Pr. 249..

It is to be noted that the appellee, in his petition for a mandate, complains only that his children and grandchildren were excluded from the school where the white children were taught. There are no allegations that there was not a sufficient number of colored children in attending distance to constitute a school, or that the trustee or trustees had failed to provide such other means of education for said children as would use their proportion, according to number, of school revenue to the best advantage. There is a general allegation that the defendants had neglected, failed, and refused to provide any school in said district, or in any adjoining district near enough for his said children and grandchildren to attend as scholars.

The question is, therefore, squarely presented, whether the children and grandchildren of the appellee were entitled to be admitted and taught in the same school with the white children of the district. The legislature has provided that a separate school shall be provided in each district for the education of the colored children therein, where there is a sufficient number of colored children, and where there is a deficiency of colored children to form one district, several districts shall be consolidated. But if separate schools can not be provided for the colored children on account of the smallness·

of the number of such children, then, such other provision is to be made by the trustee for their education as the means in his hands will enable him to do.

The legislature has not pointed out or defined what other means shall be provided. There being no averment that the trustee has failed to provide for the education of the children and grandchildren of the appellee, outside of the school for white children, no question arises as to what would be a compliance with such requirement. But if such allegation had been made, it would not have entitled the children and grandchildren of appellee to admission into the white schools, because the legislature has not provided for the admission of colored children into the same schools with the white children, in any contingency; and even if, for the sake of the argument, we were to concede that colored children are, under and by force of the fourteenth amendment, so entitled, the courts can not, in the absence of legislative authority, confer that right upon them. The legislature has declared that when schools can not be provided for the colored children, the trustee shall provide such other means for their education as will use up their full share, according to number, of the school revenue. If the trustee fails in the discharge of this duty, he may be compelled by mandate to discharge the duty imposed upon him by law.

The action of Congress, at the same session at which the fourteenth amendment was proposed to the states, and at a session subsequent to the date of its ratification, is worthy of consideration as evincing the concurrent and after-matured conviction of that body that there was nothing whatever in the amendment which prevented Congress from separating the white and colored races, and placing them, as classes, in different schools, and that such separation was highly proper and conducive to the well-being of the races, and calculated to secure the peace, harmony, and welfare of the public; and if no obligation was expected to be or was imposed upon Congress by the amendment, to place the two races and colors in the same school, with what show of reason can it be pre-

tended that it has such a compelling power upon the sovereign and independent states forming the Federal Union ?

We refer to the legislation of Congress relative to schools in the District of Columbia, at the first session of the Thirty-Ninth Congress, and the third session of the Forty-Second Congress.

On the 23d day of July, 1866, the act of Congress, entitled " an act relating to public schools in the District of Columbia," took effect. It requires the cities of Washington and Georgetown to pay over to the trustees of colored schools. of said cities such a proportionate part of all moneys received or expended for school or educational purposes in said cities, including the cost of sites, buildings, improvements, furniture, and books, and all other expenditures on account of schools, as the colored children between the ages of six and seventeen years, in the respective cities, bear to the whole number of children, white and colored, between the same ages. Acts sess. 1, 39th Cong. 222.

This was followed at the same session of Congress by an act, entitled " an act donating certain lots in the city of Washington for schools for colored children in the District of Columbia," approved July 28th, 1866, which authorized and required the Commissioner of Public Buildings to convey certain described lots, in the city of Washington, which belonged to the United States, to the trustees for colored schools for the cities of Washington and Georgetown in said District, for the sole use of schools for colored children in that District ; the said lots having been designated and set apart by the Secretary of the Interior to be used for colored schools ; and the said lots whenever converted to any other use to revert to the United States. Acts sess. 1, 39th Cong. 354.

At its 42d session an act was passed, entitled " an act to amend an act entitled 'An act governing the colored schools of the District of Columbia,'" approved March 3d, 1873, which fixes the number of the board of trustees of schools for colored children in the District of Columbia, their mode of

appointment, their duties, etc., and authorizes the Governor of the District to appoint a superintendent of schools for colored children, who is to receive a salary of twenty-five hundred dollars annually, for his services, etc., and directs the proportion of school money then due, or afterward to become due, to the board of trustees of colored schools from the cities of Washington and Georgetown, to be paid to the treasurer of said board, and not to the trustees, as provided in the act of July 23d, 1866. Acts sess. 3, 42d Cong. 260.

This legislation of Congress continues in force, at the present time, as a legislative construction of the fourteenth amendment, and as a legislative declaration of what was thought to be lawful, proper, and expedient under such amendment, by the same body that proposed such amendment to the states for their approval and ratification.

We are very clearly of the opinion that the act of May 13th, 1869, is constitutional, and that while it remains in force colored children are not entitled to admission into the common schools which are provided for the education of the white children.

In our opinion, the court below erred in affirming the action of the court in special term; and the judgment is reversed, with costs, and the cause remanded to the court below, with directions to that court to overrule the judgment of the court in special term in overruling the demurrer to the petition for a mandate.

OSBORN, J.—I am inclined to think that the allegations in the complaint are not sufficient to entitle the appellee to a mandate, and that the judgment of the court below ought to be reversed. But there is very much in the foregoing opinion in which I do not concur.

If I desired to do so, I could not, during the short time that I am to remain in my present position, properly and satisfactorily consider the questions discussed, and must therefore content myself with this qualified dissent.

ON PETITION FOR A REHEARING.

BUSKIRK, C. J.—The learned counsel for appellee has filed a very earnest, able, and elaborate brief in support of the petition for a rehearing. We have re-examined the questions involved and decided in the original opinion, and are entirely satisfied with the judgment rendered and the grounds upon which it was placed.

The petition is overruled.