THE STATE *v.* GIBSON.

CRIMINAL LAW.—*Marriage Between Whites and Negroes.—Fourteenth Amendment.—Civil Rights Bill.*—Neither the Fourteenth Amendment to the Constitution of the United States nor the Civil Rights Bill passed by Congress has impaired or abrogated the laws of this State on the subject of the marriage of whites and negroes. Such a union between members of the different races is a criminal offense by the statutes of this State.

APPEAL from the Vanderburg Criminal Court.

BUSKIRK, J.—It appears of record in this' cause, that appellee was charged by indictment in the court below with having unlawfully and knowingly married, in the county and State aforesaid, one Jennie Williams, a white woman of this State, he then and there having one-eighth· part or more of negro blood.

The indictment was, upon the motion of the appellee, quashed, and the State, by her prosecuting attorney, excepted and prosecutes this appeal to obtain a reversal of the judgment.

The indictment was based upon the forty-seventh section of the act defining felonies, which reads as follows:

"Section 47. No person having one-eighth part or more of negro blood shall be permitted to marry any white woman of this State, nor shall any white man be permitted to marry any negro woman, or any woman having one-eighth part or more of negro blood, and every person who shall knowingly marry in violation of the provisions of this section, shall, upon conviction thereof, be imprisoned in the State's prison not less than one, nor more than ten years, and be fined not less than one thousand nor more than five thousand dollars." 2 G. & H. 452.

The sole question which is presented for our consideration and decision is as to the correctness of the ruling of the court in quashing the indictment. It seems to be conceded by the appellee, that the indictment, under our code of criminal procedure, is good, in substance and matter of form, if the section of our statute above quoted is still in force; but it is earnestly maintained that all the laws of our State prohibiting the intermarriage of negroes and white persons were abrogated by the ratification of the fourteenth amendment of the constitution of the United States, and the passage of the civil rights bill. The position assumed by the attorney of the appellee is stated in these words:

"The appellee contends that all the laws of this State prohibiting the marrying of blacks and whites are abrogated by the fourteenth amendment to the constitution of the United States, and the law of Congress passed in pursuance to that amendment, which, in express terms, confers upon colored people the power of making contracts.

"Marriage, by the laws of Indiana, being only a civil contract, 1 G. & H. 428, sec. 1, it follows that the marriage specified in this indictment was lawful; and hence the judgment of the court is correct."

The only question presented for the decision of this court is, whether the position assumed by the appellee is correct. The magnitude and importance of the question involved cannot be overestimated, and we have given it our best and most thoughtful consideration. We approach its investiga-

tion, profoundly impressed with the weight of responsibility that our oath to support the Constitution of the United States and of the State of Indiana has imposed upon us.

The first section of the fourteenth amendment is in these words :

" Sec. I. All persons born or naturalized in the United States, and subject to the jurisdiction thereof are citizens of the United States, and of the state wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the law."

This amendment was proposed by Congress, June 16th, 1866, and declared by the Secretary of State to have been ratified July 28th, 1868.

This amendment contains four separate and distinct propositions : first, it confers the right of citizenship upon all persons born or naturalized in the United States, and who are subject to the jurisdiction thereof; second, it declares that no state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; third, it prohibits any state from depriving any citizen of life, liberty, or property, without due process of law; fourth, it provides that no state shall deny to any person within its jurisdiction the equal protection of the law.

It is settled by very high authority, that, in placing a construction upon a constitution or any clause or part thereof, a court should look to the history of the times, and examine the state of things existing when the constitution or any part thereof was framed and adopted, to ascertain the old law, the mischief, and the remedy. The court should also look to the nature and objects of the particular powers, duties, and rights in question, with all the light and aids of cotemporary history, and give to the words of each provision just such operation and force, consistent with their legitimate meaning, as will fairly secure the end proposed.

*Kendall* v. *The U. S.*, 12 Pet. 524; *Prigg* v. *The Common-wealth*, 16 Pet. 539.

Guided by these wise and well settled rules of interpreta-tion, we proceed to place a construction upon the section under consideration. The persons referred to in the section under examination are described as "all persons born or nat-uralized in the United States." The race or class of persons intended to be benefited are not described. It is quite mani-fest that it did not refer to persons of the white race, for when persons of that race are born in the United States, they are by birthright citizens, and when they are born elsewhere and have been naturalized under the law of Congress, they be-come citizens of the United States and of the state where they reside. We know from the history of the times that the main purpose of this amendment was to confer the right of citizenship upon persons of the African race, who had pre-viously not been citizens. When these persons became citi-zens, they were entitled to the privileges and immunities se-cured to all citizens by section two, of article four, which declares that "the citizens of each state shall be entitled to all privileges and immunities of citizens in the several states," but the framers and advocates of this amendment seemed to be unwilling to rely upon the above section, and therefore added the other clauses which were intended to ·secure to the newly made citizens the full and equal protection of the law.

The learned attorney for the appellee has not informed us, in his brief, which one of the clauses of the said section has had the effect to abrogate our laws prohibiting the intermar-riage of persons of the white and black races. It certainly cannot be the first, for the only object and effect of that clause was to confer the right of citizenship upon certain classes of persons who had not been theretofore citizens, and among these classes were persons of the African race.

Nor can the second clause be construed to have that effect. The purpose of this clause was to secure to the newly cre-ated citizens the same privileges and immunities which had

theretofore been enjoyed by the former citizens of the United States. It is quite probable that this clause had reference to the political rights and privileges of the persons who had by the first clause been made citizens of the United States and of the state wherein they resided. The purpose of the third clause was to protect the persons referred to and embraced in the first clause, in life, liberty, and property. The plain and manifest intention was to make all the citizens of the United States equal before the law in all the states of the Union. The fourth clause seems to have been added in the abundance of caution, for it provides in express terms what was the fair, logical, and just implication from what had preceded it, and that was, that the persons made citizens by the amendment should be protected by the laws in the same manner, and to the same extent, that white citizens were protected.

The fourteenth amendment contains no new grant of power from the people, who are the inherent possessors of all power, to the federal government. It did not enlarge the powers of the federal government, nor diminish those of the states. The inhibitions against the states doing certain things have no force or effect. They do not prohibit the states from doing any act that they could have done without them. The constitution was made for the protection of all citizens. It is adapted to our condition in every state of our national advancement. When new territory is acquired or new citizens created, the constitution extends itself over and protects the territory and citizen in the same manner that it extended over and protected the original thirteen states and the men who achieved our independence, and made the constitution, and formed the union of the states. From the Atlantic to the Pacific, and from the lakes to the borders of Mexico, it has stretched forth its cherishing arm over our people, and diffused its blessings on all alike. The only effect of the amendment under consideration was to extend the protection and blessings of the constitution and laws to a new class of persons. When they were made citizens they were as much entitled to the protection of the constitution and the

laws as were the white citizens, and the states could no more deprive them of privileges and immunities than they could citizens of the white race.   Citizenship entitled them to the protection of life, liberty, and property, and the full and equal protection of the laws.   Nor has the ratification of this amendment in any manner or to any extent impaired, weakened, or taken away any of the reserved rights of the states, as they had existed and been fully recognized by every department of the national government from its creation. This amendment conferred citizenship upon persons of the African race, but we will hereafter inquire and decide whether citizenship conferred on them the right to intermarry with persons of the white race.

But it is urged that the civil rights bill has abrogated the section of our statute which renders it a felony for a negro to marry a white woman of this State, or for a white man to marry a negro woman.   It is claimed that the first section of the said act which confers upon persons of the African race the right to make and enforce contracts has made it lawful for negroes, in all of the states, to make and enter into contracts of marriage with persons of the white race. The argument is, that under our laws marriage is a civil contract, and as negroes are authorized to make contracts, that, therefore, they can make any kind of contracts, notwithstanding the contract may be in violation of the laws of an independent and sovereign state.   Waiving for the present the power of Congress to pass a law authorizing any class of persons to make and enforce contracts in a state, we proceed to examine the first section of the civil rights bill, and to determine whether the position assumed by the appellee is sustained thereby.   In our opinion it is wholly untenable, and that this is demonstrated by the plain, express, and undoubted language of the said section.

The first section of the said act is in these words : " That all persons born in the United States, and not subject to any foreign power, excluding Indians not taxed, are hereby declared to be citizens of the United States; and that such

citizens of every race and color, without regard to any previous condition of slavery or involuntary servitude, except as a punishment for crime, whereof the party shall have been duly convicted, shall have the same right in every state and terrritory in the United States to make and enforce contracts, to sue, be parties and give evidence, to inherit, purchase, lease, sell, hold and convey real and personal property, and to have the full and equal benefit of all laws and proceedings for the security of person and property as is enjoyed by white persons, and shall be subject to like punishment, pains and penalties, and to none other, any law, statute, ordinance, regulation or custom to the contrary notwithstanding."

This act took effect on the 9th day of April, 1866, which was prior to the ratification of the fourteenth amendment. This amendment seems to have been mainly copied from, or modelled after the section above quoted from the civil rights bill. This section confers upon persons of the African race the power to make and enforce contracts. The power as conferred in the first part of the section is without limitation, but in the subsequent part of the section it is restricted and qualified by the plain and express declaration, that the rights conferred shall be enjoyed and exercised, in the same manner and to the same extent, " as is enjoyed by white persons." The only force and effect of this section was to confer upon persons of the African race the same civil rights, privileges, and immunities as had been enjoyed by persons of the white race.

It, therefore, becomes necessary for us to inquire whether Congress possesses the power, under the federal constitution, to pass a law regulating and controlling the institution of marriage in the several states of this union; and this will involve a brief inquiry into the nature and character of our complex system of government. Anterior to the adoption of the federal constitution, the states existed as independent sovereignties, possessing supreme and absolute power over all questions of local and internal government. The states

were independent of each other, and each possessed the power to regulate and control its domestic institutions. The government of the United States was not created by the states acting in their sovereign capacity, but the people of the several states, acting in their individual capacity. The federal government was not created for the purpose of regulating and controlling the domestic and internal affairs of the states, but the purposes of its creation are declared in the preamble to the constitution, and these are "to form a more perfect union, establish justice, insure domestic tranquillity, provide for the common defense, promote the general welfare, and secure the blessings of liberty." The states being independent, they recognized no common head. They were competent to manage and conduct their local and internal affairs, but they needed a superior and central power to regulate commerce and intercourse between the states and with foreign nations. Indeed, the whole frame of the constitution supports this construction. All the powers which relate to our foreign intercourse are confided to the general government. Congress has the power to regulate commerce with foreign nations, and among the states, to define and punish piracies and felonies committed on the high seas, and offences against the laws of nations; to declare war, to grant letters of marque and reprisal; to raise and support armies; to provide and maintain a navy; to coin money, and regulate the value thereof; to establish an uniform rule of naturalization, and uniform laws on the subject of bankruptcies in the United States; to establish post offices and post roads; to provide for calling forth the militia to execute the laws of the union, suppress insurrections and repel invasions. The powers conferred on the general government are of a general and national character, and none of them authorize or permit any interference with, or control over, the local and internal affairs of the state. The general government is one of limited and enumerated powers, and it can exercise no power that is not expressly, or by implication, granted. The people being the inherent possessors of all governmental

authority, it necessarily and logically resulted that all powers not granted to the general government, or prohibited to the state governments, were retained by the states and the people, but the great, wise, and illustrious men who framed our matchless form of government were so jealous of the right of local self-government that they were unwilling to leave the question of the reserved powers to implication and construction.    Hence, within two years after the adoption of the federal constitution, twelve amendments thereto were submitted by Congress to the states for ratification, which were ratified.    The ninth and tenth amendments read as follows:

"9th. The enumeration, in the constitution, of certain rights shall not be construed to deny or disparage others retained by the people."

" 10. The powers not delegated to the United States by the constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people."

Chief Justice CHASE, in *Lane County* v. *Oregon,* 7 Wal. 76, draws with great clearness and force the true line of distinction between the powers of the federal and state governments. He says, " the people of the United States constitute one nation, under one government, and this government, within the scope of the powers with which it is invested, is supreme.  On the other hand, the people of each state compose a state, having its own government, and endowed with all the functions essential to separate and independent existence.  The states disunited might continue to exist.  Without the states in union there could be no such political body as the United States.

" Both the states and the United States existed before the constitution.    The people, through that instrument, established a more perfect union by substituting a national government, acting, with ample power, directly upon the citizens, instead of the confederate government, which acted with powers greatly restricted, only upon the states.    But in many articles of the constitution the necessary existence of the states, and within their proper spheres the independent authority of the states, is distinctly recognized.    To them near-

ly the whole charge of interior regulation is committed or left; to them, and to the people, all powers not expressly delegated to the national government are reserved. The general condition was well stated by Mr. Madison, in the Federalist, thus: 'The federal and state governments are, in fact, but different agents and trustees of the people, constituted with different powers and designated for different purposes.'"

Mr. Justice Nelson, in delivering the opinion of the Supreme Court of the United States, in the recent case of *The Collector* v. *Day*, 11 Wal. 113, says: "It is a familiar rule of construction of the constitution of the Union, that the sovereign powers vested in the state governments by their respective constitutions remain unaltered and unimpaired, except so far as they were granted to the government of the United States. That the intention of the framers of the constitution in this respect might not be misunderstood, this rule of interpretation is expressly declared in the tenth article of the amendments, namely: 'The powers not delegated to the United States are reserved to the states, respectively, or to the people.' The government of the United States, therefore, can claim no powers which are not granted to it by the constitution, and the powers actually granted must be such as are expressly given, or given by necessary implication. The general government and the states, although both exist within the same territorial limits, are separate and distinct sovereignties, acting separately and independently of each other, within their respective spheres. The former, in its appropriate sphere, is supreme; but the states within the limits of their powers not granted, or, in the language of the tenth amendment, 'reserved,' are as independent of the general government as that government within its sphere is independent of the states.

"Upon looking in the constitution it will be found that but a few of the articles in that instrument could be carried into practical effect without the existence of the states. Two of the great departments of the government, the executive and the legislative, depend upon the exercise of the powers, or

upon the people of the states.   The constitution guarantees to the states a republican form of government, and protects each against invasion or domestic violence.   Such being the separate and independent condition of the states in our complex system, as recognized by the constitution, and the existence of which is so indispensable that without them the general government itself would disappear from the family of nations, it would seem to follow as a reasonable, if not a necessary, consequence, that the means and instruments employed for carrying on the operations of their governments, for preserving their existence and fulfilling the high and responsible duties assigned to them in the constitution should be left free and unimpaired; should not be liable to be crippled, much less defeated, by the taxing of another government, which power acknowledges no limits but the will of the legislative body imposing the tax, and, more especially, those means and instrumentalities which are the creation of their sovereign and reserved rights, one of which is the establishment of the judicial department and the appointment of officers to administer their laws.   Without this power and the exercise of it we risk nothing in saying that no one of the states under the form of government guaranteed by the constitution could long preserve its existence. A despotic government might.   We have said that one of the reserved powers was that to establish a judicial department.   It would have been more accurate and in accordance with the existing state of things at the time to have said the power to maintain a judicial department.   All of the thirteen states were in the possession of this power, and had exercised it before the adoption of the constitution, and it is not pretended that any grant of it to the general government is found in that instrument.   It is, therefore, one of the sovereign powers vested in the states by their constitutions, which remained unaltered and unimpaired, and in respect to which the state is as independent of the general government as that government is independent of the states."

In the case of *Fifield* v. *Close*, 15 Mich. 505, this language

occurs: "The same supreme power which established the departments of the general government, determined that the local governments should also exist for their own purposes, and made it impossible to protect the people in their common interests without them. Each of these several agencies is confined to its own sphere, and all are strictly subordinate to the constitution, which limits them, and independent of other agencies, except as thereby made dependent. There is nothing in the constitution which can be made to admit of any interference by Congress with the secure existence of any state authority within its lawful bounds."

Nor are we without authority in this State, sustaining and upholding the rights and powers of the State. This court, in *The State* v. *Garton*, 32 Ind. 1, says: "And has this principle, vital indeed to protect the national life, no other application? The benefit of its application has been boldly claimed by the men who have honored the highest judicial positions the nation could bestow on intellect, learning and virtue. It has protected the one from the hostile action of the many. May not its protection also be invoked to secure the many from an unauthorized exercise of power by the one? Is not the existence of the state governments as fully recognized in the Constitution of the United States as that of the national government? If the states may not exercise a power which might menace the general government, should not that hand also be held back from the throat of the former, though the pressure be at present ever so slight?

"True, the national government is our government, and we will not anticipate an attempt by it at our destruction as a state, but, as the Chief Justice remarked in discussing this very question in *M'Culloch* v. *Maryland*, 'this is not a case of confidence.'"

As to the powers of the federal and state governments, we refer to the following authorities:

The states as independent sovereignties possessed prior to the creation of the general government what is known as inter-

nal police power, and that power was not surrendered to the general government, but is still retained by the states. Mr. Justice Story, in *Prigg* v. *The Commonwealth of Pennsylvania,* 16 Pet. 625, says: "To guard, however, against any possible misconstruction of our views, it is proper to state, that we are by no means to be understood in any manner whatever to doubt or interfere with the police power belonging to the states in virtue of their general sovereignty. That police power extends over all subjects within the territorial limits of the states, and has never been conceded to the United States."

The police power of the states was very fully discussed by the Supreme Court of the United States, in *The City of New York* v. *Miln,* 11 Pet. 139, wherein it is said: "But we do not place our opinion on this ground. We choose rather to plant ourselves on what we consider impregnable positions; they are these: That a state has the same undeniable and unlimited jurisdiction over all persons and things within its territorial limits, as any foreign nation, where that jurisdiction is not surrendered or restrained by the constitution of the United States. That by virtue of this, it is not only the right, but the bounden and solemn duty of a state to advance the safety, happiness and prosperity of its people, and to provide for its general welfare, by any and every act of legislation, which it may deem to be conducive to these ends; where the power over the particular subject, or the manner of its exercise is not surrendered or restrained, in the manner just stated. That all those powers which relate to merely municipal legislation, or what may, perhaps, more properly be called internal police, are not thus surrendered or restrained; and that, consequently, in relation to these, the authority of a state is complete, unqualified, and exclusive.

"If we were to attempt a definition, we should say, that every law came within this description which concerned the welfare of the whole people of a state, or any individual within it; whether it relate to their rights, or their duties; whether it

respected them as men, or as citizens of the state; whether in their public or private relations; whether it related to the rights of persons, or property, of the whole people of a state or of any individual within it, and whose operation was within the territorial limits of the state, and upon the persons and things within its jurisdiction.    But we will endeavor to illustrate our meaning rather by exemplification than by definition.    No one will deny that a state has a right to punish any individual found within its jurisdiction, who shall have committed an offence within its jurisdiction against its criminal laws.    We speak not here of foreign ambassadors, as to whom the doctrines of public law apply. We suppose it to be equally clear, that a state has as much right to guard, by anticipation, against the commission of an offence against its laws, as to inflict punishment upon an offender after it shall have been committed.    The right to punish or prevent crime does in no degree depend upon the citizenship of the party who is obnoxious to the law.    The alien who shall just have set his foot upon the soil of the state, is just as subject to the operation of the law as one who is a native citizen."

There can be no doubt that Congress possesses the power to determine who may, or may not, make contracts, and prescribe the manner of their enforcement, in the District of Columbia, and in all other places where the federal government has exclusive jurisdiction; but we deny the power and authority of Congress to determine who shall make contracts or the manner of enforcing them in the several states. Nor is there any doubt that Congress may provide for the punishment of those who violate the laws of Congress; but we utterly deny the power of Congress to regulate, control, or in any manner to interfere with the states in determining what shall constitute crimes against the laws of the state, or the manner or extent of the punishment of persons charged and convicted with the violation of the criminal laws of a sovereign state.    In this State marriage is treated as a civil contract, but it is more than a mere civil contract.    It is a

public institution established by God himself, is recognized in all Christian and civilized nations, and is essential to the peace, happiness, and well-being of society. In fact, society could not exist without the institution of marriage, for upon it all the social and domestic relations are based. The right, in the states, to regulate and control, to guard, protect, and preserve this God-given, civilizing, and Christianizing institution is of inestimable importance, and cannot be surrendered, nor can the states suffer or permit any interference therewith. If the federal government can determine who may marry in a state, there is no limit to its power. It can legislate upon all subjects connected with, or growing out of this relation. It can determine the rights, duties, and obligations of husband and wife, parent and child, guardian and ward. It may pass laws regulating the granting of divorces. It may assume, exercise, and absorb all the powers of a local and domestic character. This would result in the destruction of the states. The federal government cannot exist without the states, but the states could exist without the federal government, as they did before its creation. There is no necessity for the destruction of either. The authority of the federal government begins where the authority of the state ceases. The state government controls all matters of a local and domestic character. The federal government regulates matters between the states and with foreign governments. There is, and can be no conflict between the state and federal governments, if each will act within the sphere assigned to each. The necessity for states and local self-government is shown by the character of our people. The customs, habits. and thoughts of the people in one state differ widely from those of the people in another state, and this results in different laws.

The laws of this state provide that males of the age of seventeen, and females of the age of fourteen years, not within the prohibited degrees of consanguinity, are capable of entering into the contract of marriage. The statute provides that the following marriages are void: when one of

the parties is a white person, and the other possessed of one-eighth or more of negro blood; and when either party is insane or idiotic, at the time of the marriage. Under the police power possessed by the states, they undoubtedly have the power to pass such laws. The people of this State have declared that they are opposed to the intermixture of races and all amalgamation. If the people of other states desire to permit a corruption of blood, and a mixture of races, they have the power to adopt such a policy. When the legislature of the State shall declare such policy by positive enactment, we will enforce it, but until thus required we shall not give such policy our sanction.

This subject is discussed with great ability, clearness, and force, by the Supreme Court of Pennsylvania, in the recent case of *The Philadelphia and West Chester R. R. Co.* v. *Miles,* 2 Am. Law Rev. 358, wherein it said: "The right to separate, being clear in proper cases, and it being the subject of sound regulation, the question remaining to be considered is whether there is such a difference between the white and black races within this State, resulting from nature, law, and custom, as makes it a reasonable ground of separation. The question is one of difference, not of superiority or inferiority. Why the Creator made one black and the other white, we do not know, but the fact is apparent, and the races are distinct, each producing its own kind, and following the peculiar law of its constitution. Conceding equality, with natures as perfect, and rights as sacred, yet God has made them dissimilar, with those natural instincts and feelings which He always imparts to His creatures, when He intends that they shall not overstep the natural boundaries He has assigned to them. The natural law which forbids their intermarriage and that social amalgamation which leads to a corruption of races, is as clearly divine as that which imparted to them different natures. The tendency of intimate social intermixture is to amalgamation, contrary to the law of races. The separation of the white and black races upon the surface of the globe is a fact equally apparent. Why this is so, it is not neces-

sary to speculate; but the fact of a distribution of men by race and color is as visible in the providential arrangement of the earth as that of heat and cold. The natural separation of the races is therefore an undeniable fact, and all social organizations which lead to their amalgamation are repugnant to the law of nature. From social amalgamation it is but a step to illicit intercourse, and but another to intermarriage. But to assert separateness is not to declare inferiority in either; it is not to declare one a slave and the other a freeman; that would be to draw the illogical sequence of inferiority from difference only. It is simply to say, that, following the order of Divine Providence, human authority ought not to compel these widely separate races to intermix. The right of such to be free from social contact is as clear as to be free from intermarriage. The former may be less repulsive as a condition, but no less entitled to protection as a right. When, therefore, we declare a right to maintain separate relations, as far as reasonably practicable, but in a spirit of kindness and charity, and with due regard to equality of rights, it is not prejudice, nor caste, nor injustice of any kind, but simply to suffer men to follow the law of races established by the Creator himself, and not to compel them to intermix contrary to their instincts."

We fully concur in, and indorse the doctrine above enunciated. It is quite clear to us, that neither the fourteenth amendment nor the civil rights bill has impaired or abrogated the laws of this State on the subject of marriage of whites and negroes. The court erred in quashing the indictment.

The judgment is reversed, and the cause is remanded, with directions to the court below to overrule the motion to quash the indictment, and to place the appellee upon his trial for the crime charged in said indictment.

*B. W. Hanna,* Attorney General, and *W. P. Hargrave,* for the State.

*A. L. Robinson,* for appellee.