## CHARLES FRASHER v. THE STATE.

1. MISCEGENATION. — Article 386 of the Penal Code (Pasc. Dig., art. 2010) which makes it felony for a white person to marry a negro or a person of mixed blood, has not been abrogated or invalidated by the adoption, since its enactment, of the 14th and 15th amendments of the Federal Consti-tution, nor by the act of Congress known as the Civil Rights Bill.

2. CONSTITUTIONAL LAW — MARRIAGE. — Power has not been conferred upon Congress to regulate or control the institution of marriage within the sev-eral states. Marriage is not a "privilege or immunity" within the mean-ing of the 14th amendment, nor is it a "contract" within the mean-ing of the Civil Rights Bill; but is a civil *status*, the rights, obligations, and duties of which are not conventional between the parties who enter into it, but are prescribed and regulated by state legislation, over which they have no control.

3. SAME. — See the opinion in this case for an analytical exposition of the policy and scope of the 14th and 15th amendments of the Federal Constitution, and of the act of Congress known as the Civil Rights Bill.

[1] WHITE, J., did not sit in this case.

4. That article 386 of the Penal Code imposes a penalty upon a white person who violates its provisions, but imposes no penalty upon the negro consort of such white person, does not impair its validity, and is a matter for legislative, not judicial, consideration.

5. Repeals by implication are not favored. Neither the emancipation of the slaves nor the consequent legislation of 1866 repealed the article of the Penal Code under consideration; nor was it affected by the provision of 1869 which legalized the marital relations of the emancipated race among themselves.

6. Public Policy.—It has always been the policy of this state to maintain separate marital relations between the whites and the blacks.

7. Indictment based upon the article in question need not, after alleging that the marriage was with a negro, notice the alternative clause relating to persons of mixed blood. It may, however, count separately upon each clause of the article, so as to meet evidence adducible under either.

8. A motion in arrest of judgment reaches substantial defects only. The omission to allege the name of the negro consort is not a substantial objection, nor available in arrest of judgment, and is cured by verdict; but would have been good on motion to quash.

9. Evidence. — The marriage license, with the officiating minister's certificate thereon, was legal evidence for the state.

10. Charge of the Court. — Trying a white man on an indictment which charged him with marrying a negro woman, it was error to charge the jury that they could convict on evidence that she was a person of mixed blood, descended from negro ancestry, etc.

Appeal from the District Court of Gregg. Tried below before the Hon. M. H. Bonner.

The opinion of the court fully discloses all material facts. The verdict and judgment awarded the appellant four years in the penitentiary.

*F. J. McCord*, for the appellant.

*George McCormick*, Assistant Attorney General, for the State.

Ector, P. J. The indictment in this case charges that on March 18, A. D. 1875, in the county of Gregg and state aforesaid, one Charles Frasher, late of the said county, be-

ing then and there a white man, did then and there unlawfully, knowingly, and feloniously marry a negro, contrary to the form of the statute in such cases made and provided, and against the peace and dignity of the state.

The indictment is based upon article 386 of our Criminal Code (Pasc. Dig., art. 2016), which reads as follows:

"Art. 2016. If any white person shall, within this state, knowingly marry a negro, or a person of mixed blood descended from negro ancestry to the third generation inclusive, though one ancestor of each generation may have been a white person, or, having so married in or out of the state, shall continue within this state to cohabit with such negro or such descendant of a negro, he or she shall be punished by confinement in the penitentiary not less than two nor more than five years."

The defendant was tried at the July term, 1877, of the District Court of Gregg County, and was convicted, and his punishment assessed at four years' confinement in the penitentiary.

The counsel for the defendant insists that the act of 1858, under which this prosecution was had, is in conflict with the 14th and 15th amendments of the Constitution of the United States and the 1st section of the Civil Rights Bill; that the statute prohibiting such marriages was passed in the interest of slavery, before that institution was abolished, and when the negro was not a citizen of the United States; and that it cannot be enforced, because it prescribes a penalty to be inflicted upon the white person alone.

The first question, then, presented for the consideration of this court is whether the positions assumed, as above stated, by the defendant's counsel, or any one of them, are correct. We are not unmindful of the importance of the questions involved, and have given them our most careful and thoughtful consideration. No question more important in its consequences, or more profoundly interesting to the

people of this country, has ever been before this court. The 1st and 5th sections of the 14th amendment to the Constitution are in these words :

" Sec. 1. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States ; nor shall any state deprive any person of life, liberty, or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the law. "

" Sec. 5. The Congress shall have power to enforce by appropriate legislation the provisions of this article. "

XVth Amendment : " 1. The right of the citizens of the United States to vote shall not be denied or abridged by the United States, or by any state, on account of race, color, or previous condition of servitude.

" 2. The Congress shall have power to enforce this article by appropriate legislation."

It is evident that the 15th amendment has no application or bearing whatever upon the question at issue.

The 14th amendment contains four separate and distinct propositions. First, it confers the right of citizenship upon all persons born or naturalized in the United States, and who are subject to the jurisdiction thereof ; second, it declares that no state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States ; third, it prohibits any state from depriving any citizen of life, liberty, or property, without due process of law ; fourth, it provides that no state shall deny to any person within its jurisdiction the equal protection of the law.

In placing a construction upon a constitution, or any clause or part thereof, a court should look to the history of the times, and examine the state of things existing when

the constitution or any part thereof was framed and adopted, to ascertain the old law, the mischief, and the remedy. The court should also look to the nature and objects of the particular powers, duties, and rights in question, with all the lights and aids of contemporary history, and give to the words of each provision just such operation and force, consistent with their legitimate meaning, as will fairly secure the end proposed. *Kendall* v. *The United States*, 12 Pet. 524; *Prigg* v. *The Commonwealth*, 16 Pet. 539.

In the *Slaughter-house Cases* the Supreme Court of the United States, in referring to the 13th, 14th, and 15th amendments of the Constitution, say : " An examination of the history of the causes which led to the adoption of those amendments, and of the amendments themselves, demonstrates that the main purpose of all the three last amendments was the freedom of the African race, the security and perpetuation of that freedom, and their protection from the oppression of the white men who had formerly held them in slavery. In giving construction to any of these articles it is necessary to keep this main purpose in view, though the letter and spirit of these articles must apply to cases coming within their purview, whether the party concerned be of African descent or not.''

We will now proceed briefly to construe the 1st section of the 14th amendment. The first clause of this amendment reads : " All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside.'' This clause declares and determines who are citizens of the United States, and how their citizenship is created. Before its enactment there had been much diversity of opinion among jurists and statesmen whether there was any citizenship independent of that of state citizenship, and, if any existed, as to the manner in which it originated. To remove this difficulty, primarily, and to establish a clear

and comprehensive definition of citizenship, and to declare what should constitute citizenship of the United States, and also citizenship of a state, the first clause of the 1st section was framed.

It clearly recognizes the distinction between citizenship of the United States and citizenship of a state. A person must reside within a state to make him a citizen of it. He must be born or naturalized in the United States to be a citizen of the Union. The Supreme Court of the United States, in construing this clause, say : " That its main purpose was to establish the citizenship of the negro can admit of no doubt. The phrase ' subject to its jurisdiction ' was intended to exclude from its operation children of ministers, consuls, and citizens or subjects of foreign states, born within the United States." 16 Wall. 36.

The language of the second clause of the section under consideration is : " No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States."

The first mention of the words " privileges or immunities " is found in the fourth of the articles of the old Confederation. In the Constitution of the United States, which superseded the Articles of Confederation, we find in section 2 of the 4th article the following words : " The citizens of each state shall be entitled to all the privileges and immunities of the citizens of the several states." This clause of the Constitution has been construed.

The first and leading case on the subject is that of *Corfield* v. *Coryell*, decided by Justice Washington, in the Circuit Court for the District of Pennsylvania, in 1832. " The inquiry," he says, " is, What are the privileges and immunities of citizens of the several states? We feel no hesitation in confining these expressions to those privileges and immunities which are fundamental; which belong of right to the citizens of all free governments, and which have

at all times been enjoyed by citizens of the several states which compose this Union, from the time of their becoming free, independent, and sovereign. What these fundamental principles are, it would be more tedious than difficult to enumerate. They may all, however, be comprehended under the following general heads: Protection by the government, with the right to acquire and possess property of every kind, and to pursue and obtain happiness and safety, subject, nevertheless, to such restraints as the government may generally prescribe for the general good of the whole.'' 4 Wash. C. C. 380.

This definition of the privileges and immunities of the citizens of the states is adopted in the main by the Supreme Court of the United States in the case of *Ward* v. *The State of Maryland*, 12 Wall. 430. See, also, *Paul* v. *Virginia*, 8 Wall. 180.

This clause under consideration did not profess to control the power of the state governments over the rights of their own citizens. Its intent and purpose was to declare to the several states that whatever those rights, as you grant or establish them to your own citizens, or as you limit or qualify them, or impose restrictions on their exercise, the same, neither more nor less, shall be the measure of the rights of citizens of the other states, within your jurisdiction. It was never the purpose of the 14th amendment, by the simple declaration that no state should make or enforce any law which shall abridge the privileges and immunities of the citizens of the United States, to transfer the security and protection of all the civil rights embraced within the entire dominion of privileges and immunities of citizens of the states from the states to the Federal government. *Crandall* v. *Nevada*, 6 Wall. 36.

It may be said that the cases cited were decided before the passage of the 14th amendment to the Federal Constitution. The Supreme Court of the United States, since the

passage of the 14th amendment, have had occasion to construe this clause. The following extract is taken from the opinion of the court:

" Was it the purpose of the 14th amendment, by the simple declaration that no state shall make or enforce any law which shall abridge the privileges and immunities of citizens of the United States, to transfer the security and protection of all the civil rights which we have mentioned from the states to the Federal government? And when it is declared that Congress shall have the power to enforce that article, was it intended to bring within the power of Congress the entire domain of civil rights heretofore belonging exclusively to the states?

"All this and more must follow, if the proposition of the plaintiffs in error be sound. For, not only are these rights subject to the control of Congress whenever in its discretion any of them are supposed to be abridged by state legislation, but that body may also pass laws in advance, limiting and restricting the exercise of legislative power by the states, in their most ordinary and usual functions, as in its judgment it may think proper on all such subjects. And, still further, such a construction, followed by the reversal of the judgment of the Supreme Court of Louisiana in these cases, would constitute this court a perpetual censor upon all legislation of the states on the civil rights of their own citizens, with authority to nullify such as it did not approve as consistent with those rights as they existed at the time of the adoption of this amendment. The argument, we admit, is not always the most conclusive which is drawn from the consequences urged against the adoption of a particular construction of the instrument.

" But when, as in the case before us, the consequences are so serious, so far-reaching and pervading, so great a departure from the structure and spirit of our institutions ; when the effect is to fetter and degrade the state govern-

ments by subjecting them to the control of Congress, in the exercise of powers heretofore universally conceded to them of the most ordinary and fundamental character; when, in fact, it radically changes the whole theory of the relations of the state and Federal government to each other, and of both these governments to the people, the argument has a force that is irresistible, in the absence of language which expresses such a purpose too clearly to admit of doubt.

" We are convinced that no such results were intended by the Congress which proposed these amendments, nor by the Legislatures of the states which ratified them." 16 Wall. 36.

Again, in the case of *Minor* v. *Happersett*, the same court held " that the 14th amendment of the Constitution of the United States does not add to the ' privileges or immunities ' of citizens, but only furnishes additional protection for the privileges, etc., already existing." 21 Wall. 162.

The third clause of the section is as follows : " Nor shall any state deprive any person of life, liberty, or property without due process of law." " Due process of law " is the application of the law as it exists, in the fair and regular course of administrative procedure.

The fourth clause of the 14th amendment is : "Nor shall any state deny to any person within its jurisdiction the equal protection of the law." This clause was added in the abundance of caution, for it provides in express terms what was the fair, logical, and just implication from what had preceded it ; and *that was* that persons made citizens by the *amendment* should be protected by the laws in the same manner and to the same extent that white citizens were protected.

In the *Slaughter-house Cases*, 16 Wall. 36, the Supreme Court of the United States say : " We doubt very much

whether any action of a state not directed by way of discrimination against the negroes as a class, or on account of their race, will ever be held to come within the purview of this provision. It is so clearly a provision for that race and that emergency, that a strong case would be necessary for its application to any other."

It is urged that the Civil Rights Bill has abrogated the section of our statute under which the indictment in this cause was found. The 1st section of the Civil Rights Bill is in these words: "That all persons born in the United States, and not subject to any foreign power, excluding Indians not taxed, are hereby declared to be citizens of the United States; and that such citizens, of every race and color, without regard to any previous condition of slavery, or involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall have the same right, in every state and territory in the United States, to make and enforce contracts, to sue, be parties, and give evidence, to inherit, purchase, lease, sell, hold, and convey real and personal property, and to have the full and equal benefit of all laws and 'proceedings for the security of person and property as is enjoyed by white persons, and shall be subject to like punishment, pains, and penalties, and to none other, any law, statute, ordinance, regulation, or custom to the contrary notwithstanding."

The 1st section of the act known as the Civil Rights Bill confers upon persons of the African race the power to make and enforce contracts. The power as conferred in the first part of the section is without limitation, but in the latter part of the section is expressly restricted and qualified by the plain declaration that the rights conferred shall be enjoyed in the same manner and to the same extent "as is enjoyed by white persons."

It therefore becomes necessary to inquire whether Con-

gress possesses the power under the Federal Constitution to pass a law regulating and controlling the institution of marriage in the several states of this Union.

Mr. Justice Nelson, in delivering the opinion of the Supreme Court of the United States in the case of *The Collector* v. *Day*, 11 Wall. 113, says : " It is a familiar rule of construction of the Constitution of the Union that the sovereign powers vested in the state governments by their respective Constitutions remain unaltered and unimpaired, except so far as they were granted to the government of the United States. That the intention of the framers of the Constitution in this respect might not be misunderstood, this rule of interpretation is expressly declared in the 10th article of the amendments, namely : ' The powers not delegated to the United States are reserved to the states respectively, or to the people.' The government of the United States can, therefore, claim no powers which are not granted to it by the Constitution, and the powers actually granted must be such as are expressly given, or given by necessary implication. The general government and the states, although both exist within the same territorial limits, are separate and distinct sovereignties, acting separately and independently of each other within their respective spheres. The former, in its appropriate sphere, is supreme, but the states, within the limits of their powers not granted, or, in the language of the 10th amendment, ' reserved,' are as independent of the general government as that government in its sphere is independent of the states."

To the same purport are *Fifield* v. *Close*, 15 Mich. 505 ; *The State* v. *Gaston*, 32 Ind. ; *The State* v. *Gibson*, 36 Ind. 389 ; *The People* v. *Brady*, 40 Cal. 198 ; *Lane County* v. *Oregon*, 7 Wall. 76 ; *The United States* v. *Cruikshank*, 2 Otto, 542 ; *Bradwell* v. *The State*, 16 Wall. 130 ; *Gibbons* v. *Ogden*, 9 Wheat. 203.

Within this class which is not granted or secured by the Federal Constitution, but left to the exclusive protection of the states, is that immense class of legislation mentioned by Chief Justice Marshall in *Gibbons* v. *Ogden*, 9 Wheat. 203, which embraces everything within the territory of a state not surrendered to the general government, and which is necessary in the regulation of the police, morals, health, internal commerce, and general prosperity of a community, and which is justly subject to state regulation. See, also, *The Commonwealth* v. *Kemball*, 24 Pick. 350.

Mr. Justice Story, in *Prigg* v. *The Commonwealth*, 16 Pet. 625, says: "To guard, however, against possible misconstruction of our views, it is proper to state that we are by no means to be understood in any manner whatever to doubt or interfere with the police power belonging to the states in virtue to their general sovereignty. That police power extends over all subjects within the territorial limits of the states, and has never been conceded to the United States."

The police power of the states is very ably discussed by the Supreme Court of the United States, in the case of *The City of New York* v. *Miln*, 11 Pet. 139. In this last case cited the court says "that all those powers which relate to merely municipal legislation, or what may more properly be called internal police, are not thus surrendered or restrained; and that consequently, in relation to these, the authority of a state is complete, unqualified, and exclusive."

Mr. Buskirk, Justice of the Supreme Court of Indiana, has so ably discussed the question, in an opinion delivered by him, that at the expense of being tedious we will copy a portion of what he has said, fully indorsing the same. He says: "There can be no doubt that Congress possesses the power to determine who may or may not make contracts, and prescribe the manner of their enforcement, in the District of Columbia and in all other places where the

Federal government has exclusive jurisdiction ; but we deny the power and authority of Congress to determine who shall make contracts, or the manner of enforcing them, in the several states.   Nor is there any doubt that Congress may provide for the punishment of those who violate the laws of Congress ; but we deny the power of Congress to regulate, control, or in any manner to interfere with the states in determining what shall constitute crimes against the laws of the state, or the manner or extent of punishment of persons charged and convicted with the violation of the criminal laws of a sovereign state.   In this state marriage is treated as a civil contract ; but it is more than a civil contract.   It is a public institution established by God himself, is recognized in all Christian and civilized nations, and is essential to the peace, happiness, and well-being of society. In fact, society could not exist without the institution of marriage, for upon it all the social and domestic relations are based.   The right in the states to regulate and control, to guard, protect, and preserve this God-given, civilizing, and Christianizing institution, is of inestimable importance, and cannot be surrendered, nor can the states suffer or permit any interference therewith.   If the Federal government can determine who may marry in a state, there is no limit to its power.   It can legislate upon all subjects growing out of this relation.   It can determine the rights, duties, and obligations of husband and wife, parent and child, guardian and ward.   It may pass laws regulating the granting of divorces.   It may assume, exercise, and absorb all the powers of a local and domestic character.   This would result in the destruction of the states." *The State* v. *Gibson*, 36 Ind. 389.

Mr. Bishop, in his standard work on Marriage and Divorce ( vol. 1, 4th ed., sec. 87), says : "All our marriage and divorce laws, and, of course, all statutes on the subject, so far as they pertain to localities embraced within the

territorial limits of the particular states, are state laws and state statutes; the national power with us not having legislative or judicial cognizance of the matter within their localities.''

Marriage is not a contract protected by the Constitution of the United States, or within the meaning of the Civil Rights Bill. Marriage is more than a contract within the meaning of the act. It is a civil *status*, left solely by the Federal Constitution and the laws to the discretion of the states, under their general power to regulate their domestic affairs. The rights, obligations, and duties arising from it are not left to be regulated by the agreement of the parties, but are matters of municipal regulation, over which the parties have no control.

The Supreme Court of North Carolina, in the very recent case of *The State* v. *Kennedy*, reported in 4 C. L. J. 391, says: "There can be no doubt of the power of every country to make laws regulating the marriage of its subjects, to declare who they may marry, how they may marry, and the consequences of their marrying." It is clear to our minds that neither the 14th amendment nor the Civil Rights Bill has abrogated article 386 of our Criminal Code. Pasc. Dig., art. 2016.

Again, the counsel for the defendant insists that, because the statute under which the indictment was found in this case affixes a penalty upon the white person alone, and none upon the negro, it therefore violates the 14th and 15th amendments of the Constitution of the United States, and the 1st section of the Civil Rights Bill. It is conceded by him that, if the statute upon which this prosecution is based punished both the white person and the negro alike, it would not be obnoxious to the objections he urges against it, but would be constitutional, and clearly within the legislative powers of the state.

It is, then, conceded that the states can prohibit the

intermarriage of the races, and it therefore follows, as the night follows the day, that this state can enforce such laws as she may deem best in regard to the intermarriage of whites and negroes in Texas, provided the punishment for its violation is not cruel or unusual. If she cannot, what is to prevent it? The objection to our statute, that it does not punish both parties alike, should be addressed to the legislative, and not to the judicial, branch of the government. Can it be truly said that the law is illegal because the race sought to be protected by " the amendments " and " the Civil Rights Bill " is not punished?

Civilized society has the power of self-preservation, and, marriage being the foundation of such society, most of the states in which the negro forms an element of any note have enacted laws inhibiting intermarriage between the white and black races. And the courts, as a general rule, have sustained the constitutionality of such statutes.

We are aware that the Supreme Court of Alabama, Judge Saffold delivering the opinion of the court, has held that a statute of that state which prohibited the intermarriage of whites and negroes was abrogated by the 14th amendment to the Federal Constitution; but this opinion is not supported by reason or authorities. *Burns* v. *The State*, 48 Ala. 195.

Has the law of this state, passed in 1858, making it a felony for a white person to marry a negro, been repealed? We think not. Implied repeals are not favored; nothing but a statute will repeal a statute. Sedgw. on Stat. & Const. Law, 96, 105.

During the period since the negroes were emancipated the law-making power of Texas has not only failed to repeal article 2016, but the Legislature of 1866, chapter 128, page 131, in repealing laws " relating to slaves and free persons of color," expressly " provided, nevertheless, that nothing herein shall be so construed as to repeal any law prohibiting

the intermarriage of the white and black races." The Constitution of 1869, chapter 12, section 27, legalized the marriage of those who had been living together as husband and wife, *and both of whom, by the law of bondage,* were precluded from the rites of marriage ; but this only applied to negroes. See *Clements* v. *Crawford,* 42 Texas, 601.

It has always been the policy of this state to maintain separate marital relations between the whites and the blacks. It is useless for us to cite the different statutes on this subject, enacted from time to time, showing that the people of Texas are now, and have ever been, opposed to the intermixture of these races. Under the police power possessed by the states they undoubtedly, in our judgment, have the power to pass such laws. If the people of other states desire to have an intermixture of the white and black races, they have the right to adopt such a policy. When the Legislature of this state shall declare such a policy by positive enactment, we will enforce it ; until this is done, we will not give such a policy our sanction.

The defendant moved the court to quash the indictment because the same does not charge any offense known to the law, and because it does not allege that said party married a negro within the third generation inclusive. The court properly overruled defendant's motion to quash. By recurring to article 386 of our Criminal Code (Pasc. Dig., art. 2016), it will be seen that it is made a felony for any white person in this state to knowingly marry a negro, or a person of mixed blood descended from negro ancestry to the third generation inclusive, etc. In this case the indictment charges that the defendant was a white person, and that he knowingly married a negro.

The defendant also filed a motion in arrest of judgment. The fifth ground set out in the motion in arrest of judgment is as follows : " Because the bill fails to charge the name of the woman or negro that defendant is charged to

have married." We think the failure to describe the party by name that defendant married should have been taken advantage of by motion to quash, and not in arrest, and that the verdict cured the omission. The offense was charged in the terms of the statute (to the disjunctive "or"), and hence good on general exception. Had the exception been taken before the trial, it should have been sustained.

A motion in arrest of judgment reaches substantial defects only. Pasc. Dig., art. 3143. There are only three grounds of exception to the *substance* of an indictment in the Code, and the above is not one of them. Pasc. Dig., art. 2954.

Exceptions to matters not of substance must be taken before the trial by motion to quash ; not by motion in arrest. *Terrell* v. *The State*, 41 Texas, 464 ; *The State* v. *Williams*, 43 Texas, 502 ; *Hauck* v. *The State*, 1 Texas Ct. App. 357 ; *Long* v. *The State*, 1 Texas Ct. App. 466.

The certainty required in an indictment is such as will enable the accused to plead the judgment that may be given upon it in bar of any prosecution for the same offense. Pasc. Dig., art. 2865.

Had the name been given, the state would have been held to prove it as alleged ; but if not given, and no motion to quash it on this account, then, in a subsequent prosecution, the defendant, under a plea of *autrefois* convict or acquit, could introduce evidence *aliunde* to identify the transaction. *Cook* v. *Burnley*, 45 Texas, 97.

An indictment might be so framed by the pleader, in cases like this, as to meet the proof on the trial, by having two counts in it ; the first count charging that the defendant married a negro, and the second count charging that he married a person of mixed blood descended from a negro within the third generation, inclusive, from said negro.

The District Court properly admitted in evidence the marriage certificate, with the return thereon of the minister who performed the marriage ceremony. The state did not rely, however, upon this marriage certificate alone to prove the marriage, but submitted to the jury the testimony of a person who was present and witnessed the marriage.

The evidence shows that the defendant was married to one Mrs. Lettuce Howell, in the county of Gregg, about the time charged in the indictment. The first witness introduced by the state "described Lettuce Howell as having kinky hair, a flat nose, thick lips, of a ginger-bread complexion, nearly black, and that she was known by everybody as a negro." Upon cross-examination this witness said "he thought *she had white blood in her*."

Emma Olliver, another state's witness, on her cross-examination, testified that she knew Lettuce Howell, *alias* Lettuce Bell, had *white blood in her*. These were the only witnesses examined on this point.

"After the argument of any criminal cause has been concluded, the judge shall deliver to the jury a written charge, in which he shall distinctly set forth the, law applicable to the case; but he shall not express any opinion as to the weight of evidence, nor shall he sum up the testimony. This charge shall be given in all cases of felony, whether asked or not." Pasc. Dig., art. 3059.

The last instruction given by the learned district judge who presided at the trial is in the following words: "The allegation that the defendant married a negro is not sustained by evidence that he married a person of mixed blood, unless it is shown that she comes within the class designated in the law as negroes."

This charge was calculated to mislead, and doubtless did mislead, the jury. The jury might well conclude that under the instructions of the court they could find the defendant

guilty if they were satisfied from the evidence that he married Lettuce Howell, and "that she was a person of mixed blood, descended from negro ancestry."

For this error in the charge of the court the judgment must be reversed and the cause remanded.

*Reversed and remanded.*