# Green v. The State.

*Indictment of White Person and Negro for Intermarrying.*

1. *Constitutional law; § 4189 of Code, validity of.*—Section 4189 of the Code, which makes it an offense for a white person and negro to intermarry, and inflicts upon persons of the different races living together in adultery, equal, though severer punishment than where that offense is committed by persons of the same race,—is a valid law of this State, and not violative of the Constitution or laws of the United States. (Overruling *Burns v. The State*, 48 Ala. 195.)

2. *Marriage; power of State over.*—Marriage is not a mere contract, but a

V ol. lviii.

[Green v. The State.]

social or domestic institution, upon which are founded all society and order, to be regulated and controlled by the sovereign power for the good of the State; and the several States of the Union, in the adoption of the recent amendments to the Constitution of the United States, designed to secure to citizens rights of a civil or political nature only, did not part with their hitherto unquestioned power of regulating, within their own borders, matters of purely social and domestic concern.

APPEAL from Circuit Court of Butler.

Tried before Hon. JOHN K. HENRY.

The indictment in this case charged, that before the finding thereof, "Aaron Green, a negro man, and Julia Atkinson *alias* Green, a white woman, did intermarry with each other against the peace," &c.

The defendant, Julia, demurred to the indictment, on the ground that it charged no offense; but her demurrer was overruled, and the trial proceeded on plea of not guilty. The bill of exceptions recites, "the facts were undisputed and admitted by the defendant, which established all the allegations of the indictment. It was further admitted, and undisputed by the defendant, that the marriage took place in Butler county, Alabama, on the 13th day of July, 1876. Thereupon, the court charged the jury, if they believed the evidence, they must find the defendant guilty. The defendant excepted to this charge."

The jury found the defendant guilty, and the court thereon sentenced her to imprisonment in the penitentiary for two years, and she appealed.

P. O. HARPER, for appellant, cited and relied on the case of *Burns v. The State*, 48 Ala. 195.

JOHN W. A. SANFORD, Attorney-General, *contra.*—The case of *Burns v. The State*, should be overruled. It is not supported by reason or authority.—See *Ellis v. The State*, 42 Ala. 525, and *Gibson v. The State*, 36 Indiana, 404. This last case contains a very exhaustive discussion of the question.

MANNING, J.—The question this record presents is, whether or not the State may make the marriage of a white person with a person of the negro race, a punishable offense. The statute is as follows: "If any white person and any negro, or the descendant of any negro to the third generation inclusive, though one ancestor of each generation was a white person, intermarry, or live in adultery or fornication, with each other, each of them must, on conviction, be imprisoned in the penitentiary, or sentenced to hard labor for the county, for not less than two, nor more than seven years."—§ 4189 (3602) of Code of 1876.

[Green v. The State.]

This statute was assailed, so far as it concerned the living "in adultery or fornication," of a man and woman of the different races, in *Ellis v. The State*, 42 Ala. 525, and *Ford v. The State*, 53 Ala. 150. For the like offense between a man and woman of the *same* race, a penalty less severe was denounced.—§ 4184 (3598). And this inequality of punishment was supposed to bring the section first quoted above, into conflict with the "civil rights act" of congress, enacted to prevent certain discriminations against persons of African descent, on account of race, color or previous condition of servitude. But this court, in both the cases, held the law in question to be valid.

In *Burns v. The State*, (48 Ala. 195,) according to the 4th head-note, the decision in *Ellis v. The State (supra)*, was overruled. *Burns*, a justice of the peace, had as such performed the rites of matrimony between a white person and a negro, contrary to a statute; and having been convicted of and fined for the offense, our immediate predecessors reversed the judgment; holding, that the section first above cited and that under which the conviction was had, were in conflict with the act of congress referred to, and therefore void.

The argument in support of this decision was as follows: "Marriage is a civil contract, and in that character alone is dealt with by the municipal law. The same right to make a contract as is enjoyed by white citizens—means the right to make and contract which a white citizen may make. The law intended to destroy the distinction of race and color, in respect to the rights secured by it." And again: "One of the rights secured by citizenship, therefore, is, that of suing any other citizen. The civil rights bill now confers this right upon the negro in express terms, as also the right to make and enforce contracts," [neither of which was ever denied to a free person of any color, in the courts of this State,] "amongst which, is that of marriage with any citizen capable of entering into that relation."

This seems to us a very narrow and an illogical view of the subject. And it might, perhaps, be a sufficient answer to it to say: What the law declares to be a punishable offense, is, marriage *between* a white person and a negro. And it no more tolerates it in one of the parties than the other—in a white person than in a negro or mulatto; and each of them is punishable for the offense prohibited, in precisely the same manner and to the same extent. There is no discrimination made in favor of the white person, either in the capacity to enter into such a relation, or in the penalty. Moreover, at the time of the passage of the so-called "civil rights act," similar laws to those of Alabama existed against such inter-

[Green v. The State.]

marriages in several, perhaps in nearly all, of the Northern States, whose representatives in congress voted for that act; and as no mention was made in the act, or in any other act of congress, of such intermarriages, the presumption is that it was not intended to secure to persons of the negro race any greater rights in those Northern States, or consequently in any other, than they already enjoyed in them. It is apparent, therefore, that the statute of Alabama is not in conflict with the act of congress, if that be consistent to the extent supposed, with the constitution of the United States.

But the subject should be regarded with a broader view. Is marriage, as the argument objected to assumes, nothing more than a civil contract? Is it, "in that character alone," dealt with by the municipal law?

Doubtless, it is by a contract—that is, by the agreement of the parties—that they enter into the state of marriage. But, as was said by the Supreme Court of Delaware, it is a contract " of a peculiar character and subject to peculiar principles. It may be entered into by persons who are not capable of forming any other lawful contract; it can be violated and annulled by law, which no other contract can be; it can not be determined by the will of the parties, as any other contract may be; and its rights and obligations are derived rather from the law relating to it, than from the contract itself."—*Townsend v. Griffin*, 4 Harrington, 440. According to Judge Story : " Marriage is not treated as a mere contract between the parties, subject as to its continuance, dissolution and effects, to their mere pleasure and intentions. But it is treated as a civil institution, the most interesting and important in its nature, of any in society."—Confl. of Laws, § 200. Ch. J. Robertson, of Kentucky, said of it : "*As every well organized society is essentially interested in the existence and harmony and decorum* of all its social relations, marrige, the most elementary and useful of them all, is regulated and controlled by the sovereign power of the State, and can not, like mere contracts, be dissolved by the mutual consent only of contracting parties, but may be abrogated by the sovereign will, either with or without the consent of both parties, whenever the public good, or justice to both or either of the parties will be thereby subserved. Such a remedial and conservative power is inherent in every independent nation, and cannot be subjected to political restraint or foreign control, consistently with the public welfare. And, therefore, marriage, being much more than a contract, and depending essentially on the sovereign will, is not, as we presume, embraced by the constitutional interdiction of legislative acts impairing the obligation of contracts."—*Maguire*

(13)

[Green v. The State.]

*v. Maguire*, 7 Dana, 181. And Mr. Bishop, (from whose work on Marriage and Divorce, the foregoing extracts are taken, and who insists that marriage is not a contract, but a *status*,) says : "The fact that parties enter into marriage only over the threshold of a contract, furnishes all the foundation there exists for the exceedingly loose definition which terms it a contract."—1 vol. § 12 (36 a).

This institution is, indeed, "the most interesting and important in its nature of any in society." It is through the marriage relation that the *homes* of a people are created—those homes in which, ordinarily, all the members of all the families of the land are, during a part of every day, assembled together; where the elders of the household seek repose and cheer, and reparation of strength from the toils and cares of life ; and where, in an affectionate intercourse and conversation with them, the young become imbued with the principles, and animated by the spirit and ideas, which in a great degree give shape to their characters and determine the manner of their future lives. These homes, in which the virtues are most cultivated and happiness most abounds, are the true *officinæ gentium*—the nurseries of States. Who can estimate the evil of introducing into their most intimate relations, elements so heterogeneous that they must naturally cause discord, shame, disruption of family circles and estrangement of kindred ? While with their interior administration, the State should interfere but little, it is obviously of the highest public concern that it should, by general laws adapted to the state of things around them, guard them against disturbances from without.

Hence it is, that, if not in every State of the Union, in all of them in which any considerable numbers of the negro race resided, statutes have been enacted prohibiting marriages between them and persons of the white race. Said the Supreme Court of Pennsylvania, in a recent case : "Why the Creator made one white and the other black, we do not know ; but the fact is apparent, and the races are distinct, each producing its own kind and following the peculiar law of its constitution. Conceding equality, with natures as perfect and rights as sacred, yet God has made them dissimilar. . . . . The natural law, which forbids their intermarriage and that amalgamation which leads to a corruption of races, is as clearly divine as that which imparted to them different natures."—*Phila. & W. Chester R. R. Co. v. Miles*, 2 Amer. Law Rev. 358—(cited in *State v. Gibson*, 36 Ind. 404.)

It depends very much, of course, upon the relative proportions and condition of the two races in any State, whether legislation of the kind in question is necessary there or not.

[Green v. The State.]

It is, also, a fact not always sufficiently felt, that the more humble and helpless families are, the more they need this sort of protection. Their spirits are crushed, or become rebellious, when other ills besides those of poverty, are heaped upon them. And there are (we presume) but few localities any where in the United States, in which the conviction has not obtained, and been approved by minds the most sedate, that the law should absolutely frustrate and prevent the growth of any desire or idea of such an alliance, and all the secret arts, practices and persuasions of servants or others upon the weak-minded or froward, to bring it about—by making marriage between the two races, legally impossible, and severely punishing those who perform, and those who, with intent to be married, go through the ceremonies thereof. Manifestly, it is for the peace and happiness of the black race, as well as of the white, that such laws should exist. And surely there can not be any tyranny or injustice in requiring both alike, to form this union with those of their own race only, whom God hath joined together by indelible peculiarities, which declare that He has made the two races distinct.

How, then, can it be maintained that the States of this Union, in adopting amendments which make no allusion to such intermarriages, intended to deprive themselves of the important power of regulating matters of so great consequence and delicacy within their own borders for themselves, as it always was their undoubted right to do. In an able and emphatic opinion, the Supreme Court of Indiana unanimously decided, that this had not been done.—*State v. Gibson*, 36 Ind. 389. A similar decision has been lately made in Texas, in a case of *Frasher v. The State*, according to a note in the Central Law Journal, (vol. 6, p. 1). We have not, however, any report of the case. The jurisdiction of the State of North Carolina over the same subject, and the validity of her laws prohibiting such intermarriages, are assumed to be beyond question, by the Supreme Court of that State, in the cases of *The State v. Ross* and the *Same v. Kennedy*, 76 N. C. 242 and 251. And, in a case on *habeas corpus*, before him, Judge DUVAL, a Federal judge, holding the District Court of the United States at Austin, Texas, commenting on the same statute of Texas which was held valid by the Supreme Court of that State, as mentioned above, said : " Marriage between the two races is wholly abhorrent to my sense of fitness and propriety ; and I presume it would be no violation of the constitution and laws of the United States—inasmuch as marriage is but a civil contract, to be regulated by the laws of the several States—were the State of Texas now

to pass a law forbidding such marriages, under penalties extending to both races alike." But he thought the law then under consideration void, "because it would visit a heavy penalty upon a white citizen, and none whatever upon a colored citizen, for doing a certain act."—5 Cent. L. J. 149.

The amendments to the Constitution were evidently designed to secure to citizens, without distinction of race, rights of a civil · or political kind only—not such as are merely social, much less those of a purely domestic nature. The regulation of these belongs to the States. It is a satisfaction to find this recognized, impliedly, in an opinion of the Chief Justice of the United States, announcing the recent decision of the Supreme Court upon the civil rights act of Louisiana. This statute required those engaged in the transportation of passengers to carry colored persons in the same cars, cabins, &c., as whites : And the Supreme Court decided that *so far as it applied to foreign and inter-State commerce*, it was void, *because the regulation of such commerce* was, by the · constitution, reserved to the congress of the United States. Of the statute, the Chief Justice said : " It does not act upon the business, *through the local instruments to be employed after coming within the State*—but directly upon the business as it comes into the State from without, or goes out from within.
.   .   .   A passenger in the cabin set apart for whites without the State, must, when the boat comes within, share the accommodations of that cabin, with such colored persons as may come on board afterwards, if the law is enforced.   .   .   . The river Mississippi passes through, or along the borders of ten different States, and its tributaries reach many more. The commerce upon these waters is immense, and its regulation clearly a matter of national concern. If each State was at liberty to regulate the conduct of carriers while within its jurisdiction;   .   .   .   .   it could prescribe rules by which the carrier must be governed within the State, in respect to passengers and property brought from without. On one side of the river, or its tributaries, he might be required to observe one set of rules, and on the other another. Commerce can not flourish in the midst of such embarrassments. No carrier of passengers can conduct his business with satisfaction to himself, or comfort to those employing him, if on one side of a State line, his passengers, both white and colored, must be permitted to occupy the same cabin, and on the other kept separate."

For these reasons, and to the extent mentioned, the " civil rights" law of Louisiana was declared to be unconstitutional and void.—6 Cent. L. J. 102.

It will be observed, that it is not asserted by the court,

that congress has any authority over such matters by virtue of the 14th, or any other amendment to the constitution. Nor is it intimated that those amendments secured the objects which the Louisiana act was designed to effect. On the contrary, it seems to be admitted that but for the clause, which was in the constitution from the beginning, giving to the general government the power "to regulate commerce with foreign nations and among the several States," the States might, respectively, enact such laws as to them should seem expedient in respect to the social intercourse, while travelling, of their own citizens of the two races; and that these laws might be very different on one side of a river or of an imaginary line across it.

No amendment to the Constitution, nor any enactment thereby authorized, is in any degree infringed by the enforcement of the section of the Code, under which the appellant in this cause was convicted and sentenced.

In view of the decision made by our predecessors in *Burns v. The State, supra,* which is hereby overruled, we trust that the Executive of the State will find just reasons in this case, why appellant should receive a pardon.

In performance of our duty, the judgment of the circuit court must be affirmed.